IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| HILDENE OPPORTUNITIES MASTER FUND LTD, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 14-1110-CV-W-ODS |
| ARVEST BANK, BANNISTER BANCSHARES, INC. and JEFFREY JERNIGAN, | ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER AND OPINION GRANTING IN PART, DENYING IN PART, AND DEFERRING IN PART DEFENDANTS' MOTIONS TO DISMISS**

Pending are Defendants Arvest Bank's, Bannister Bancshares, Inc.'s, and Jeffrey Jernigan's Motions to Dismiss Plaintiff's Second Amended Complaint. Doc. #63, Doc. #65. The Motions are granted in part, denied in part, and deferred in part.

**I.   BACKGROUND**

In 2003, Bannister Bancshares ("Bannister") created a wholly-owned trust subsidiary ("Bannister Trust") with U.S. Bank serving as Trustee and Jeffrey Jernigan ("Jernigan") served as an administrator of the Bannister Trust. At or around the same time, Bannister also entered into an indenture agreement ("Bannister Indenture") with U.S. Bank serving as Indenture Trustee. Second Amended Complaint ("SAC"), ¶ 10. Pursuant to the Bannister Indenture, Bannister issued $20 million in debentures. SAC, ¶ 3. Bannister Trust purchased the debentures Bannister issued. SAC, ¶¶ 4, 20. To raise the funds necessary to purchase the debentures, Bannister Trust issued 20,000 Capital Securities. SAC, ¶ 17. Under this arrangement, Bannister was required to make payments on the debentures to Bannister Trust, and Bannister Trust was required to make payments on the Bannister Trust Capital Securities. SAC, ¶ 22.

Bannister owned Union Bank and used the money raised from the issuance of the Bannister Debentures to fund Union Bank's operations. SAC, ¶ 16. Union Bank

was Bannister's only substantial asset. SAC, ¶ 3. This is significant because Section 3.7 of the Bannister Indenture prohibited Bannister from selling or conveying "all or substantially all of its property" unless Bannister complied with Article XI of the Bannister Indenture. SAC, ¶ 24. Section 11.1 of Article XI of the Bannister Indenture permitted:

> [The] sale, conveyance, transfer or other disposition of the property or capital stock of the Company…as an entirety, or substantially as an entirety, to any other Person…<u>provided however</u>, that the Company hereby covenants and agrees that, upon any such …sale, conveyance, transfer or other disposition, the due and punctual payment of the principal of (and premium, if any) and interest on all of the Debentures in accordance with their terms, according to their tenor, and the due and punctual performance and observance of all the covenants and conditions of this Indenture…shall be expressly assumed…by the entity which shall have acquired such property or capital stock.

SAC, ¶ 25; Doc. #64-1 (emphasis in original). This provision (the "Successor Obligor Provision") prohibits Bannister from selling all or substantially all its property unless the purchaser of that property agrees to assume Bannister's obligations under the Bannister Indenture. SAC, ¶ 26. In June 2012, Arvest Bank ("Arvest") purchased Union Bank, but Arvest did not assume Bannister's obligations under the Bannister Indenture.[1] SAC, ¶¶ 5, 27. Bannister has failed to make payments on the Debentures to Bannister Trust, and thus, Bannister Trust has failed to make payments on the Capital Securities. SAC, ¶ 60.

Based on these factual averments, Plaintiff Hildene Opportunities Master Fund, Ltd.,[2] as assignee of U.S. Bank, asserts claims for Tortious Interference with Contract against Arvest (Count I), Breach of Contract against Bannister (Counts II and III), and Breach of Fiduciary Duty against Jernigan (Count IV).

---

[1] Whether Arvest was obligated to do so is a point of contention between the parties, and the Court is not resolving this issue.

[2] In its First Amended Complaint, Plaintiff Hildene Capital Management, LLC, asserted similar claims based on similar factual allegations. However, in its Order granting in part and denying in part Defendants' Motions to Dismiss Plaintiff's First Amended Complaint, the Court held that Hildene Capital Management, LLC, had not established it was either (1) the real party in interest to assert these claims, or (2) that it was a third party beneficiary of the Bannister Indenture. Doc. #57. Thus, the Court granted Plaintiff leave to file a Second Amended Complaint to accomplish one or both of these tasks. In response, Plaintiff Hildene Opportunities Master Fund, Ltd. ("Plaintiff") filed its Second Amended Complaint, and therein, asserts U.S. Bank assigned its claims set forth in the Second Amended Complaint to Plaintiff. SAC, ¶ 9.

## II. **STANDARD**

The liberal pleading standard created by the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting Fed. R. Civ. P. 8(a)(2)). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). In ruling on a motion to dismiss, the Court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the Plaintiff[ ]." *Stodghill v. Wellston Sch. Dist.*, 512 F.3d 472, 476 (8th Cir. 2008).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 555 U.S. 662, 678 (2009) (internal quotations and citations omitted).

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 679.

### III. DISCUSSION
#### A. Tortious Interference with Contract (Count I)
#### 1. Applicable State Law for Statute of Limitations

Arvest maintains Arkansas's three-year statute of limitations bars Plaintiff's tortious interference with contract claim. "A federal court sitting in diversity applies the statute-of-limitations rules of the forum." *Great Plains Trust Co. v. Union Pacific R. Co.*, 492 F.3d 986, 992 (8th Cir. 2007) (citing *Nettles v. Am. Tel. & Tel. Co.*, 55 F.3d 1358, 1362 (8th Cir. 1995)). "When a cause of action 'originates' in a state other than Missouri,…Missouri applies the foreign state's statute of limitations through Missouri's borrowing statute." *Alvarado v. H & R Block, Inc.*, 24 S.W. 3d 236, 241-42 (Mo. Ct. App. 2000). The Missouri borrowing statute provides, "Whenever a cause of action has been fully barred by the laws of the state, territory or country in which it originated, said bar shall be a complete defense to any action thereon, brought in any of the courts of this state." Mo. Rev. Stat. § 516.190. Accordingly, Missouri's borrowing statute bars an action if (1) the action originated in another state and (2) the other state's statute of limitations bars the action. *Alvarado*, 24 S.W. 3d at 241-42. Missouri courts have construed the term "originated" to mean "accrued." *Thompson by Thompson v. Crawford*, 833 S.W.2d 868, 871 (Mo. 1992). Section 516.100 defines "accrued" as "when the damage resulting therefrom is sustained and is capable of ascertainment." "Missouri's borrowing statute pre-empts any conflict of laws question." *Alvarado*, 24 S.W.3d at 242.

Here, the parties dispute which state's law applies to Plaintiff's tortious interference claim. Plaintiff maintains Missouri law is applicable; Defendant Arvest maintains Arkansas law is applicable.

Plaintiff contends the Court should use the "most significant relationship test" to determine which state's law is applicable, but this test determines the substantive law to apply to the tortious interference claim. This test does not govern the law to apply for the statute of limitations. Regardless, Plaintiff states Arvest entered Missouri to negotiate the purchase of and conduct due diligence of Union Bank and to take actions which resulted in Bannister breaching the Indenture's Successor Obligor Provision. Plaintiff notes Arvest has many bank branches in Missouri and that Defendants

4

Bannister and Jernigan are also located in Missouri. Plaintiff also claims the underlying Indenture and Bannister Trust transaction involved Missouri entities. Finally, Plaintiff argues that through Arvest's alleged tortious interference it obtained Missouri assets.

Arvest asserts that Arkansas is the home of its headquarters, and that it allegedly committed acts of tortious interference from its principal place of business. Arvest also asserts Plaintiff's principal allegation is that Arvest's counsel made misrepresentations to the Arkansas State Banking Board. Arvest argues that a tort generally accrues where the defendant's alleged wrongful conduct occurs, but the case Arvest cites in support of this argument is discussing accrual for determining venue, not statute of limitations. *See State ex rel. Mo. Prop. & Cas. Ins. Guar. Ass'n v. Brown*, 900 S.W. 2d 268, 271-72 (Mo. Ct. App. 1995).

Neither party adequately explained where the alleged tortious interference accrued. Plaintiff incorrectly applies the significant relationship test, and Arvest incorrectly applies a test for determining venue. Neither party explained when and consequently where (1) the damage resulting from the alleged tortious interference was sustained and (2) was capable of ascertainment. Accordingly, the Court currently is not in a position to determine whether Arkansas or Missouri law applies to the statute of limitations for the tortious interference claim.[3] The Court denies Arvest's Motion to Dismiss on this basis.[4]

---

[3] Plaintiff asserts Defendant Arvest should be judicially estopped from arguing in its second Motion to Dismiss that Arkansas law applies to the tortious interference with contract claim, because in its first Motion to Dismiss Arvest claimed Missouri law applied to the tortious interference claim. In determining whether judicial estoppel should be applied, courts consider the factors set forth in *New Hampshire v. Maine*: (1) whether the positions a party took in the two proceedings are "clearly inconsistent," (2) whether the earlier court has accepted the position in such a manner that either the first or second court would appear to have been misled, (3) and whether the party asserting inconsistent positions would derive an unfair advantage or impose an unfair detriment. 532 U.S. 742, 750-51 (2001).

First, it is not clear that Arvest actually took inconsistent positions. While Arvest argued in its first round of Motion to Dismiss briefing that Missouri law should be applied to the tortious interference with contract claim, Arvest also noted that the tortious interference claim would fail under Arkansas law. Doc. #29, page 16.

Second, this Court did not accept Arvest's earlier position that Missouri law applied to the tortious interference claim. In fact, the Court did not reach the merits of this claim at all. Doc. #57. Plaintiff notes some courts apply judicial estoppel even if the court did not adopt the party's prior position, but this is a minority view. *Hossaini v. W. Missouri. Med. Ctr.*, 140 F. 3d 1140, 1143 (8th Cir. 1998). The Eighth Circuit consistently places importance on judicial acceptance of a party's prior inconsistent position. *See e.g. E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 679-80 (8th Cir. 2012); *Capella Univ., Inc. v. Executive Risk Specialty Ins. Co.*, 617 F.3d 1040, 1051 (8th Cir. 2010); *Stallings v. Hussman Corp.*, 447 F.3d 1041, 1049 (8th Cir. 2006).

5

## 2. Failure to State a Claim

Arvest also argues Plaintiff fails to state a claim for tortious interference with contract. It is not clear to the Court whether Missouri or Arkansas law applies to this claim, but the elements of a tortious interference claim under each state's law are similar. Under Arkansas law, Plaintiff must establish (1) the existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interfering party, (3) intentional and improper interference inducing or causing a breach or termination of the relationship, and (4) resultant damage to the party whose relationship has been disrupted. *Hunt v. Riley*, 909 S.W. 2d 329, 332 (Ark. 1995); *West Memphis Adolescent Residential, LLC v. Compton*, 374 S.W. 3d 922, 927 (Ark. Ct. App. 2010). Under Missouri law, Plaintiff must demonstrate (1) a contract, (2) knowledge by defendant of the contract, (3) intentional interference by defendant which induces a breach of contract, (4) absence of justification, and (5) resulting damages. *Kantel Comms., Inc. v. Casey*, 865 S.W. 2d 685, 690 (Mo. Ct. App. 1993); *Francisco v. Kansas City Start Co.*, 629 S.W. 2d 524, 529 (Mo. Ct. App. 1981).

First, Arvest maintains no breach of the Indenture occurred, because the Successor Obligor Provision applies only to the sale of Bannister's assets; the provision does not apply to the sale of Bannister's subsidiaries' (i.e., Union Bank) assets. Arvest asserts that prior to its purchase of Union Bank, Bannister owned stock shares in Union Bank; and after the Union Bank purchase, Bannister owned the same stock shares in Union Bank. Arvest emphasizes that Bannister did not sell its Union Bank stock shares to Arvest, and thus, Bannister did not sell any of its assets to Arvest. Instead, Union Bank sold its own assets to Arvest.

Arvest argues that a case Plaintiff repeatedly relies upon to demonstrate a breach occurred, *In re BankAtlantic Bancorp, Inc. Litigation*, is factually distinguishable

---

Because Arvest's prior position is not clearly inconsistent with its current position and because the Court did not adopt Arvest's prior position, the Court declines to judicially estop Arvest from arguing Arkansas applies to the tortious interference claim.

[4] While the Court is not determining which state's statute of limitations is applicable to Plaintiff's tortious interference claim, and thus, whether the claim is barred by those statute of limitations; the Court notes Plaintiff's Second Amended Complaint does not relate back to its original Complaint or its First Amended Complaint. As more fully explained in Section D, Arvest cannot be said to have been on notice that U.S. Bank's assignee would bring a claim against it.

from the proceedings in this case. 39 A.3d 824 (Del. Ch. 2012). As a preliminary matter, a Delaware court's decision is not binding authority on this Court. Nonetheless, in the Delaware case, Bancorp held 100% of the equity in its subsidiary Bank Atlantic, and attempted to sell its stock in BankAtlantic to an entity named BB & T Corporation, in violation of an indenture's successor obligor provision. *Id.* at 826, 835. Arvest contends that unlike Bancorp, Bannister did not sell its own stock. According to Arvest, then, the *Bancorp* case is inapplicable and the Indenture was not breached. Whether Arvest's purchase of Union Bank constitutes a sale of all or substantially all of Bannister's assets is not an issue that can be resolved at this juncture. Rather, the Court finds Plaintiff has pleaded sufficient factual allegations which permits this Court to draw the reasonable inference that Arvest's purchase of Union Bank could be considered a sale of all or substantially all of Bannister's assets. For instance, Plaintiff asserts in its Second Amended Complaint that Union Bank was Bannister's only substantial asset and that "U.S. Bank, as the Trustee overseeing the Indenture, declared Bannister in default under the successor obligor provision of the Indenture, on grounds that the sale of Union Bank to Arvest constituted a sale of substantially all of Bannister's assets." SAC, ¶¶ 3, 37.

Second, Arvest contends that even if the Indenture were breached, Plaintiff has not sufficiently pleaded that Arvest caused the breach. Arvest points to *Downing v. Riceland Foods, Inc.* in support of its position, but the *Downing* Court only addressed whether a breach of contract occurred, not whether the defendant in that case had induced the breach. No. 4:13-321, 2014 WL 4145406, at * 8 (E.D. Mo. Aug. 20, 2014).

Arvest also turns to *Tri-Continental Leasing Co. v. Neidhardt* for support. 540 S.W.2d 210 (Mo. Ct. App. 1976). However, the procedural posture in the *Tri-Continental Leasing* case was the appeal of a trial court's ruling to sustain the defendants' motions for a directed verdict and thereby setting aside the jury verdict. Here, the Court is reviewing the sufficiency of Plaintiff's pleading in its Second Amended Complaint. Therein, Plaintiff states (1) that Arvest "persuaded and/or conspired with Bannister to breach" the Indenture's Successor Obligor Provision, (2) that "in order to clinch Bannister's agreement to disregard the successor obligor provision of the indenture, Arvest hired Jernigan as an Executive Vice President/Business to

7

development…," and (3) that Arvest misrepresented to the Arkansas State Bank Board that it was not required under the Indenture's Successor Obligor Provision to assume the debenture obligations. SAC ¶¶ 5, 7, 39. The Court finds Plaintiff has pleaded sufficient facts supporting an inference that evidence will be presented demonstrating Arvest caused or induced the alleged breach of the Indenture.

Third, Arvest claims it did not participate in any improper conduct. Arvest maintains it was justified in purchasing Union Bank because the purchase helped prevent Union Bank's failure and "the harm that would have resulted to its depositors and the community." Doc. #64, page 21. Arvest may have had a justification for its actions, but the Court's review of Plaintiff's Second Amended Complaint demonstrates Plaintiff has adequately pleaded that Arvest employed improper means. Under Missouri law, "[i]mproper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Stehno v. Sprint Spectrum, L.P.*, 186 S.W. 3d 247, 252 (Mo. 2006). Under Arkansas law, courts looks to the following factors to determine if an actor's conduct is improper: "(a) the nature of the actor's conduct, (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; and (f) the proximity or remoteness of the actor's conduct to the interference and the relations between the parties." *J.D. Fields & Co., Inc. v. Nucor-Yamato Steel*, 976 F. Supp. 2d 1051, 1066 (E.D. Ark. 2013). Here, Plaintiff asserts Arvest misrepresented to the Arkansas State Bank Board that the *Bancorp* decision was inapplicable to the Union Bank purchase, and thus, Arvest was not required to assume Bannister's debenture obligations. Plaintiff asserts Arvest made this misrepresentation despite its knowledge that U.S. Bank's and other creditors' views were that Arvest *was* required to assume the debenture obligations. SAC, ¶¶ 7, 30, 31, 33. Plaintiff has sufficiently pleaded factual allegations leading to the inference that Plaintiff will present evidence establishing Arvest used improper means to tortiously interfere with the Indenture.

8

Finally, Arvest argues Plaintiff cannot demonstrate any resultant damage. Arvest claims Plaintiff's position is that Union Bank was necessary for Bannister's performance under the Indenture. Arvest notes, though, that the FDIC had a $116.6 million lien on Union Bank, and Plaintiff does not explain how it would have gained priority over this FDIC lien. Whether this FDIC lien would have prevented Bannister from performing under the Indenture is an issue for resolution at a later date. As of now, Plaintiff has more than adequately pleaded that it has suffered damages due to Arvest's alleged tortious interference. For example, Plaintiff states in its Second Amended Complaint that "Bannister never paid any of the outstanding deferred interest due under the Indenture…", and that "U.S. Bank sustained substantial economic losses in the form of loss of payments of principal and interest under the TruPS." SAC, ¶¶ 60, 68. Accordingly, Arvest's Motion to Dismiss is denied.

### B. Breach of Contract (Counts II and III)

Plaintiff asserts two claims for breach of contract based on allegations that Defendant Bannister did not fulfill its obligations pursuant to the Indenture. The parties agree and Section 14.5 of the Indenture states that New York law governs the Indenture without regard to conflict of law principles. Doc. #64-1, page 48. To state a claim for breach of contract under New York law, Plaintiff must establish (1) the existence of a contract, (2) plaintiff's performance under the contract, (3) the defendant's breach of that contract, and (4) resulting damages. *PFM Packaging Machinery Corp. v. ZMY Food Packing, Inc.*, 131 A.D.3d 1029, 1030 (N.Y. App. Div. 2015); *Hampshire Props. v. BTA Bldg. & Developing, Inc.*, 122 A.D. 3d 573, 573 (N.Y. App. Div. 2014).

#### 1. Count II

In its first breach of contract claim, Plaintiff maintains Bannister breached the Indenture because Bannister did not comply with its obligations under the Successor Obligor Provision. Specifically, Plaintiff alleges Bannister disregarded its obligations pursuant to the Successor Obligor Provision when Arvest purchased Union Bank. Bannister claims Plaintiff has failed to state a claim for breach of contract, because the Successor Obligor Provision only applies to Bannister, it does not apply to Bannister's subsidiaries. As discussed earlier in Section III.A.2, however, the Court finds Plaintiff

9

has pleaded sufficient facts leading to the reasonable inference that evidence will be presented demonstrating Bannister breached the Indenture, and Bannister's Motion to Dismiss Count II is denied.

### 2. Count III

In its second breach of contract claim, Plaintiff contends Bannister breached the Indenture because Bannister failed to pay interest when due under the Indenture. Bannister did not substantively address this Count in its opening Motion to Dismiss. Instead, Bannister addressed this claim for the first time in its Reply Suggestions in supports of its Motion to Dismiss, arguing Plaintiff has failed to plead when the interest was due, what triggered the payment, or how Plaintiff performed under the Indenture. However, it is improper for a party to raise new arguments in a reply brief. *Gilmore v. Preferred Credit Corp.*, No. 10-0189, 2011 WL 111238, at *2 (W.D. Mo. Jan. 13, 2011); *King v. Clarke Cty., Ala.*, No. 12-0312-CG-C, 2012 WL 5287040, at *7 (S.D. Ala. Sept. 27, 2012); *Dytch v. Yoon*, No. 10-02915, 2011 WL 839421, at *3 (N.D. Cal. Mar. 7, 2011); *Performance Contracting, Inc. v. Rapid Response Const., Inc.*, 267 F.R.D. 422, 425 (D.D.C. 2010). Accordingly, the Court declines to consider Bannister's new arguments, and its Motion to Dismiss Count III is denied.

### C. Breach of Fiduciary Duty (Count IV)

Plaintiff asserts Defendant Jernigan breached his fiduciary duties pursuant to the Bannister Trust "by failing to safeguard the Trust's property" and rejecting the position that Arvest's purchase of Union Bank triggered the Indenture's Successor Obligor Provision. SAC, ¶ 76. The parties agree and Section 13.2 of the Bannister Trust states that Connecticut law governs the trust and the parties to the trust and that "all rights and remedies shall be governed by [Connecticut law] without regard to the principles of conflict of laws of the State of Connecticut or any other jurisdiction that would call for the application of the law of any jurisdiction other than the State of Connecticut." Doc. #44-2, page 43.

Under Connecticut law, the statute of limitations for a breach of fiduciary claim is three years. *Ahern v. Kappalumakkel*, 903 A.2d, 266, 273 n.3 (Conn. App. Ct. 2006). Defendant Jernigan argues Plaintiff has filed its claim for breach of fiduciary duty out of

10

time, and the Court agrees. According to Plaintiff's Second Amended Complaint, Arvest purchased Union Bank in June 2012. Thus, Jernigan breached his alleged fiduciary duty no later than June 2012.

However, in this proceeding, Plaintiff is U.S. Bank's assignee. It is well-settled law that "an assignee stands in the shoes of an assignor." *Nat'l Loan Investors Ltd. Partnership v. Heritage Square Associates*, 733 A.2d 876, 879 (Conn. App. Ct. 1999). An assignee has the same rights and limitations as the assignor. *Gianetti v. Health Net of Conn., Inc.*, 976 A.2d 23 (Conn. App. Ct. 2009); *Fairfield Credit Corp. v. Donnelly*, 264 A.2d 547 (Conn. 1969); *also see Hemar Ins. Corp. of Am. v. Ryerson*, 108 S.W.3d 90, 95 (Mo. Ct. App. 2003); *Doss v. EPIC Heathcare Mgmt. Co.*, 901 S.W.2d 216, 222 (Mo. Ct. App. 1995).

As such, Plaintiff has the same rights and limitations as U.S. Bank. U.S. Bank's claim for breach of fiduciary duty began to run in June 2012 and expired by June 2015. After June 2015, Connecticut's statute of limitations bars U.S. Bank's breach of fiduciary claim against Jernigan. Because U.S. Bank is barred from bringing a claim; Plaintiff, as U.S. Bank's assignee, also is barred from doing so after June 2015. Here, Plaintiff, as U.S. Bank's assignee, filed its Second Amended Complaint on August 7, 2015. Doc. #58. Thus, Plaintiff's claim for breach of fiduciary duty against Jernigan is barred by the statute of limitations.

Plaintiff argues the Second Amended Complaint relates back to its first Complaint and First Amended Complaint. Plaintiff grounds its argument in two Eighth Circuit decisions discussing an advisory committee note to Federal Rule of Civil Procedure 15. *See Plubell v. Merck & Co.*, 434 F.3d 1070 (8th Cir. 2006); *Crowder v. Gordons Transps., Inc.*, 387 F.2d 413 (8th Cir. 1967). The advisory committee note states:

> The relation back of amendments changing plaintiffs is not expressly treated in revised Rule 15(c) since the problem is generally easier. Again the chief consideration of policy is that of the statute of limitations, and the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs. Also, relevant is the amendment of Rule 17(a) (real party in interest). To avoid forfeiture of just claims, revised Rule 17(a) would provide that no action shall be dismissed on the ground that it is not

11

> prosecuted in the name of the real party in interest until a reasonable time has
> been allowed for correction of this defect in the manner there stated.

In *Plubell*, the Eighth Circuit observed that in determining whether an amendment adding a new plaintiff relates back to original complaint, "federal courts generally either interpret Rule 15(c)(3) or apply a judicially-created test." 434 F.3d at 1072. The judicially created test examines whether (1) the original complaint gave the defendant adequate notice of the claims of the newly-proposed plaintiff, (2) the relation back unfairly prejudices the defendant, and (3) there is an identity of interest between the original plaintiff and the newly-proposed plaintiff. *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1132 (11th Cir. 2004). The *Plubell* Court noted that "[b]oth tests consider the same factors and often yield the same result." 434 F.3d at 1072.

Here, Plaintiff's argument fails under either analysis. The mere fact that Plaintiff's three complaints are based on the same factual allegations is insufficient. Defendant cannot be said to have known that U.S. Bank's assignee would bring a claim against him. U.S. Bank's potential claims against Jernigan are wholly different in nature than those of either Hildene Opportunities Master Fund, Ltd. or Hildene Capital Management, LLC. U.S. Bank was Trustee for the Indenture and for the Bannister Trust. According to the First Amended Complaint, Hildene Opportunities Master Fund, Ltd. was a holder of downstream CDO notes and Hildene Capital Management, LLC is the manager of Hildene Opportunities Master Fund, Ltd. The relationship U.S. Bank has to these transactions and the consequent damage it may have incurred because of these transactions is fundamentally different than that of the Hildene entities. Just because Hildene brought a claim based on the same facts, does not mean Jernigan was on notice that U.S. Bank would bring claims. In fact, U.S. Bank has not asserted claims for years. Additionally, there is no identity of interest between Plaintiff and U.S. Bank. *See e.g., Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313 (6th Cir. 2010); *Raynor Bros. v. Am. Cyanimid Co.*, 695 F.2d 382 (9th Cir. 1982); *Staren v. Am. Nat'l Bank & Trust Co. of Chicago*, 529 F.2d 1257 (7th Cir. 1976).

Finally, the *Plubell* and *Crowder* cases provide no support for Plaintiff's position. In *Plubell*, Carol Richardson, "as class representative, filed a class action lawsuit against Merck… alleging deceptive trade practices in the development and marking of

Case 4:14-cv-01110-ODS   Document 78   Filed 01/25/16   Page 12 of 15

Vioxx." 434 F.3d at 1071. Thereafter, Richardson determined she was mistaken about the company that had manufactured her pain medication. *Id.* Thus, Plaintiff's counsel "sought leave to amend the petition, substituting a new class representative, Mary Plubell, for Richardson." *Id.* The *Plubell* Court determined that the amended petition related back to the initial pleading because Defendant Merck was on notice of Plubell's claim because she already was a member of the potential class, noting that "Plubell is only 'newly-added' in that she became the named class representative." *Id.* at 1073. In *Plubell*, the first and second Plaintiff would have had the exact same relationship with Defendant Merck; and thus, would have had the exact same type of claims. Here, as discussed in the previous paragraph, U.S. Bank's relationship with Jernigan is not the same as the Hildene entities' relationships with Jernigan (if the Hildene entities have a relationship with Jernigan at all).

In *Crowder*, Ruth Crowder, as administratrix of her deceased husband's estate, filed a lawsuit against the defendant, seeking damages on her own behalf and on behalf of her two minor sons. 387 F.2d at 414. Later, Crowder filed an Amended Complaint, as mother and next friend of her two minor sons, seeking damages on their behalf. *Id.* The *Crowder* Court determined that the amended complaint related back to the initial complaint because the "defendant was clearly advised by the original complaint that each of the minors was seeking damages against it for the wrongful death of their father…" *Id.* at 419. Here, the same cannot be said, as Jernigan was not on notice in either the original Complaint or the First Amended Complaint that U.S. Bank was seeking damages against him. Rather, the first two complaints in this case only put Jernigan on notice that the Hildene entities were seeking damages. As such, Plaintiff's Second Amended Complaint does not relate back to its original Complaint or its First Amended Complaint, and the Court dismisses Count IV of Plaintiff's Complaint.

### D. Champerty

Defendants argue that U.S. Bank's assignment of the claims raised in this lawsuit to Plaintiff is champertous. New York's champerty law provides:

> No person or co-partnership…and no corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit,

13

> buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon.

N.Y. Jud. Law § 489(1). "The 'critical issue' in determining whether an assignment is champertous is 'the purpose behind [the plaintiff's] acquisition of rights that allowed it to sue [the defendant].'" *BSC Associates, LLC v. Leidos, Inc.*, 91 F. Supp. 3d 319, 325 (N.D.N.Y. 2015) (citing *Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. v. Love Funding Corp.*, 918 N.E.2d 889 (N.Y. 2009)). "'[I]n order to fall within the statutory prohibition, the assignment must be made for the very purpose of bringing suit and this implies an exclusion of any other purpose.'" *Id.* at 326 (citing *Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 270 N.E. 2d 691 (N.Y. 1971)). An assignment will not be considered champertous if the assignee plaintiff has a significant, preexisting interest in the repayment of the subject loan. *Id.* at 327-328; *see also Trust for Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. v. Love Funding Corp.*, 591 F.3d 116 (2d Cir. 2010).

Plaintiff attached a Declaration to its Opposition to Defendants' Motions to Dismiss, indicating Plaintiff does have an interest in the repayment of the underlying transacation that preexists the U.S. Bank assignment. Doc. #73-1. Defendants argue Plaintiff has pleaded facts in its Opposition that were not pleaded in its Second Amended Complaint and that the Court should not consider materials outside of the pleadings.

The Court agrees Plaintiff has recited new, unpleaded facts in its Opposition. However, the Court will not exclude Plaintiff's Declaration and will treat the motions on the issue of champerty as ones for summary judgment under Federal Rule of Civil Procedure 56. *See* FRCP 12(d). As such, the Court will give Defendants an opportunity to present material that is pertinent to the motion on the issue of champerty. The Court directs Defendants to file their Responses on or before Februrary 8, 2016. The Court will permit Plaintiff to file its Reply to Defendants' Responses on or before February 22, 2016.

## IV. **CONCLUSION**

In sum, the Court dismisses Count IV of Plaintiff's Second Amended Complaint, but Counts I, II, and III remain. The Court also gives notice to the parties that the issue of champerty will be treated as a Motion for Summary Judgment. Defendants shall file their Responses on or before February 8, 2016; and Plaintiff will file its Reply to Defendants' Responses on or before February 22, 2016. Finally, the Court lifts the stay in this case and directs the parties to file a new Proposed Scheduling Order on or before February 16, 2016.

IT IS SO ORDERED.

DATE: January 25, 2016

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT