# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| HILDENE OPPORTUNITIES MASTER FUND, LTD. )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ARVEST BANK, *et al.* )<br>)<br>Defendants. ) | Case No. 4:14-cv-01110-ODS |

## DEFENDANT ARVEST BANK'S SUGGESTIONS
## IN OPPOSITION TO HILDENE'S MOTION TO EXCLUDE
## CERTAIN TESTIMONY OF ANTHONY M. SANTOMERO

SQUIRE PATTON BOGGS (US) LLP
Joseph C. Weinstein (admitted *pro hac vice*)
joe.weinstein@squirepb.com
Sean L. McGrane (admitted *pro hac vice*)
sean.mcgrane@squirepb.com
4900 Key Tower, 127 Public Square
Cleveland, OH 44114
Tel: (216) 479-8500
Fax: (216) 479-8780

*Attorneys for Defendant Arvest Bank*

SHOOK, HARDY & BACON L.L.P.
Michael S. Cargnel
mcargnel@shb.com
Jenna Sheldon-Sherman
jsherman@shb.com
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
Fax: (816) 421-5547

*Attorneys for Defendant Arvest Bank*

## PRELIMINARY STATEMENT

Hildene makes two meritless arguments in support of its motion to exclude certain testimony of Arvest Bank's expert, Anthony M. Santomero, a distinguished Wharton School banking and finance professor, the former President of the Federal Reserve Bank of Philadelphia and one of the country's most knowledgeable experts on the banking industry.  <u>First</u>, Hildene argues that in performing his valuation of the trust preferred securities at issue in this case (the "Bannister TruPS"), Mr. Santomero improperly relied on the Federal Deposit Insurance Corporation's $120 million cross-guaranty against the assets of Union Bank (the "FDIC Cross Lien") because (Hildene argues) the FDIC purportedly lacked "legal authority" to assess and enforce the Cross Lien.  <u>Second</u>, Hildene argues that certain of Mr. Santomero's expert testimony regarding the value of the Bannister TruPS is unreliable for a variety of other reasons.

Hildene's first argument is straight out of Fantasyland.  The existence and applicability of the FDIC Cross Lien is not a matter of opinion (expert or lay); ***it is an undisputed fact***.  The FDIC (i) assessed the Cross Lien against the assets of Union Bank in August 2011; (ii) made clear to the parties at an October 2011 meeting that its Cross Lien had priority against all other claims to Union Bank's assets; and (iii) waived the Cross Lien by order dated June 19, 2012, to ensure the closing of the Union Bank Transaction and thereby prevent Union Bank's failure.  If Hildene believes the FDIC Cross Lien was somehow not valid or enforceable – a position that (i) Hildene has never previously articulated, (ii) is wrong under the law, and (iii) is contradicted by Hildene's letters at the time of the Union Bank Transaction and the allegations of the Second Amended Complaint – then Hildene's gripe is with the FDIC, not with Mr. Santomero.  In any event, the issue is not appropriate for a *Daubert* motion because "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility . . . .".  *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005).

Hildene's second argument – that certain of Mr. Santomero's opinions regarding the value of the Bannister TruPS are unreliable – also clearly goes to weight and not admissibility, as this Court and others have held over and over again. *See, e.g., Honsinger v. UMB Bank, N.A.*, Case No. 06-0018-CV-W-ODS, 2007 U.S. Dist. LEXIS 84350, at *3 (W.D. Mo. Nov. 14, 2007) (Smith, J.) ("[D]istrict courts should not . . . confuse matters of impeachment with matters of admissibility.").

Hildene's motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Bannister TruPS

1. Defendant Bannister Bancshares, Inc. is a bank holding company organized under the laws of Missouri. (ECF No. 151-4.) Bannister owned approximately 97.5% of the stock of Union Bank, which was a state-chartered bank organized under the laws of Missouri and based in Kansas City, Missouri. (ECF No. 151-5 at 55:1-17, 131:14-23; ECF No. 151-6.)

2. In December 2003, Bannister issued approximately $20 million in trust preferred securities, which are debt obligations that entitle their holders to periodic interest payments and a repayment of the principal at the expiration of a specified term. (ECF No. 151-1 at § 2.1; Exhibit A at ¶¶ 18-20.)

3. Union Bank was Bannister's only operating subsidiary. Thus, Bannister's ability to pay its TruPS was contingent on Union Bank paying upstream dividends to Bannister, which could then be paid to the TruPS holders.

4. Hildene does not own and has never owned any of the Bannister TruPS. Rather, Hildene owns what it concedes is a very "small" interest in notes issued by a downstream collateralized debt obligation. ECF No. 114 at ¶ 15; *id.* at p. 1.

B. **Union Bank's financial condition deteriorates in the wake of the global financial crisis, and the FDIC assesses the Cross Lien.**

5. Beginning in or around 2008, the global financial crisis and the attendant collapse of the real estate market caused a rapid erosion of Union Bank's capital and a massive deterioration of its real estate loan portfolio. (ECF No. 151-5 at 154:23 - 155:6, 165:7 - 166:20; ECF No. 151-11 at p. 2.)

6. On October 5, 2009, the FDIC issued a Cease and Desist Order in which it stated that Union Bank had been engaging "in unsafe and unsound banking practices," including (i) "operating with inadequate liquidity in light of the Bank's assets and liability mix;" and (ii) "operating with inadequate earnings." (ECF No. 151-12 at pp. 1-3.) The FDIC Cease and Desist Order expressly prohibited Union Bank from issuing any upstream dividends to its parent company, Bannister, which in turn meant that Bannister could not make payments on the TruPS. (*Id.* at p. 7; ECF No. 151-5 at 165:7-16.)

7. Around this same time, Bannister notified U.S. Bank – the holder of the Bannister TruPS and the purported assignor of Hildene's claims in this action – that it would suspend making quarterly interest payments on its TruPS obligations, as it was entitled to do without penalty for a five-year period under the terms of the indenture contract governing the Bannister TruPS (the "Indenture"). (ECF No. 151-13.)

8. On July 7, 2010, Bannister and the Federal Reserve Bank of Kansas City entered into a written agreement prohibiting Bannister from making "any distributions of interest, principal, or other sums" on the Bannister TruPS without the Federal Reserve Bank's prior approval. (ECF No. 151-14 at ¶ 2.)

9. On or around August 12, 2011, the FDIC assessed the Cross Lien against the assets of Union Bank. (ECF No. 151-15 at p. 1.) The FDIC Cross Lien was assessed as a result of the

failure of Union Bank's sister bank, First National Bank-Olathe, which was closed by the Office of the Comptroller of the Currency on or around August 12, 2011. (*Id.*)[1]

10. By February 13, 2012, the Federal Reserve Bank of Kansas City had concluded that "Union Bank's condition has deteriorated to the point where its long term-viability is in question. Asset quality problems have resulted in operating losses that have depleted capital. Union Bank is now considered Significantly Undercapitalized and is in dire need of capital resources." (ECF No. 151-17 at p. 1.)

11. Reviewing Union Bank's financials from the first quarter of 2012, Hildene's analyst in charge of Midwestern banks observed that Union Bank "would probably not have made it another quarter." (ECF No. 162-2 at p. 2; ECF No. 162-3 at 29:9-25.)

12. Similarly, Hildene's own valuation expert, Paul Huygens, testified that Union Bank was "not long for the world and something needed to be done to either shut it down, to sell it, or to – or it would otherwise have been taken over by the FDIC." (ECF No. 151-18 at 173:13-17; *see also id.* at 97:3-12, 178:21-23.)

> C. **Arvest Bank agrees to purchase substantially all of the assets and assume substantially all of the liabilities of Union Bank, preventing its failure.**

13. Beginning in or around 2008, Arvest Bank actively began looking for opportunities to enter the Missouri side of the Kansas City market – where, at the time, Arvest Bank did not have a significant presence. (ECF No. 151-2 at 40:18 – 42:16.)

14. Arvest Bank and Union Bank began arm's-length negotiations regarding a potential transaction in earnest in mid-to-late 2010.

---

[1] First National Bank-Olathe and Bannister were both subsidiaries of a multibank holding company called First Olathe Bancshares, Inc. (Exhibit R at p. 1; Exhibit S.) Union Bank, in turn, was a subsidiary of Bannister. (*Id.*) Thus, both First National-Bank Olathe (directly) and Union Bank (indirectly) were subsidiaries of First Olathe Bancshares, Inc. (Exhibit R at p. 1.)

15. On October 7, 2011, the FDIC presided over a meeting in Kansas City with representatives from Union Bank and Arvest Bank to discuss the Cross Lien – which, Arvest Bank made clear in negotiations, would need to be waived in order for Arvest Bank to proceed with any transaction. (ECF No. 151-2 at 100:4 – 102:14; ECF No. 151-22.) Mark Moylan, the Deputy Regional Director of the FDIC's Kansas City office, led the meeting, which was attended by two additional FDIC officials. (ECF No. 151-21 at ARVEST001094-95.) Thomas Raupp, a director of Union Bank who was at the meeting, testified that the FDIC "made it abundantly clear that they could act at any time to impose their cross guaranty which would cause Union Bank to fail." (ECF No. 151-5 at 47:10-18.) The FDIC further emphasized that its Cross Lien had priority over all other creditors or claims. (ECF No. 151-2 at 102:4-14.) The FDIC indicated, however, that if Union Bank and Arvest Bank reached a deal, it would consider waiving the Cross Lien, subject to a formal request from Union Bank and approval by FDIC leadership in Washington, D.C. (ECF No. 151-22; ECF No. 151-21 at ARVEST001097.)

16. On or around January 27, 2012, Arvest Bank and Union Bank executed an Asset Purchase and Assumption Agreement (the "Asset Purchase Agreement"). (ECF No. 151-24.) Through the Asset Purchase Agreement, Arvest Bank agreed to (i) purchase substantially all of the banking assets of Union Bank and (ii) assume substantially all of the liabilities of Union Bank – including $405 million in deposits that Union Bank owed to its customers (and may not have been able to pay in the absence of a deal with Arvest Bank). (*Id.; see also* ECF No. 151-2 at 23:17-21.)

17. As part of the consideration for the Union Bank Transaction, the Asset Purchase Agreement called for Arvest Bank to make a future contingent payment to Union Bank after five

- 5 -

years depending on the performance of the loan and foreclosed real estate portfolio acquired from Union Bank. (ECF No. 151-24 at §2.1.3.)

18. Closing of the Union Bank Transaction was conditioned on a number of things, including the FDIC's waiver of the Cross Lien and various regulatory approvals. (*Id.* at §§ 12.3 – 12.4.)

> D. **Hildene acknowledges the existence and applicability of the FDIC Cross Lien in contemporaneous communications to regulators, and never once questions its enforceability.**

19. Between March 14, 2012 and April 13, 2012, Hildene sent at least three letters to various parties (including the Regional Director of the FDIC, the Federal Reserve Bank of St. Louis and the Arkansas State Bank Department) in which it criticized and threatened to enjoin the closing of the Union Bank Transaction. (ECF No. 151-26-28). In none of these letters did Hildene question the applicability or enforceability of the FDIC Cross Lien. ***To the contrary: In its letter to the Arkansas State Bank Department dated April 13, 2012, Hildene expressly recognized the existence and applicability of the FDIC Cross Lien and acknowledged that the Cross Lien could render Union Bank insolvent:***

> If the Company is in fact insolvent or will be [sic] become insolvent as a result of the FDIC enforcing its cross guaranty liability relating to the OCC's closing of the First National Bank of Olathe, it should file a petition with an appropriate bankruptcy court to supervise the sale of Union Bank and/or its assets . . .

(ECF No. 151-28 at p. 2; *id.* at 3 ("Counsel for the Company has indicated that the Proposed Transaction was structured to avoid application of ***provisions of the Federal Deposit Insurance Act that make Union Bank liable for a portion of an affiliated bank, the First National Bank of Olathe.***")).

20. Neither Hildene nor its purported assignor, U.S. Bank, ever sought to enjoin the closing of the Union Bank Transaction. Nor did either ever question the applicability or enforceability of the FDIC Cross Lien.

- 6 -

### E. The FDIC waives the Cross Lien and the Union Bank Transaction closes.

21. On June 19, 2012, the FDIC issued an "Order Accepting Partial Satisfaction of Cross-Guarantee Liability and Conditionally Granting Approval for Partial Waiver of Cross-Guarantee Liability" (the "FDIC Order"). (ECF No. 151-15.)

22. The FDIC Order began by noting that "pursuant to 12 U.S.C. § 1815(e)(1)(A), at the time of Olathe's failure, Union incurred a cross-guarantee liability to the FDIC in the amount of the FDIC's actual and anticipated losses in connection with Olathe's failure, approximately $120 million." (*Id.*)

23. The FDIC Order went on to state that "the Board of Directors of the FDIC, having fully considered the facts and information . . . has concluded that accepting partial satisfaction of the cross-guarantee liability and granting the request for a waiver of the remainder of the cross-guarantee liability is in the best interests of the Deposit Insurance Fund and that approval of the request should be and hereby is granted," subject to certain conditions and restrictions. (*Id.* at p. 3.)

24. The principal condition upon which the waiver was granted was that Union Bank (or its liquidator) pay to the FDIC 85% of any future contingent payments Union Bank received from Arvest Bank during the five year term contained in the Asset Purchase Agreement. (*Id.* at p. 4, ¶ 3.)

25. Following the waiver of the FDIC Cross Lien and the receipt of all requisite regulatory approvals, the Union Bank Transaction closed on June 22, 2012. (ECF No. 151-33 at p. 6.)

### F. Relevant procedural background.

26. Hildene commenced this action as the purported assignee of U.S. Bank on August 7, 2015. In the operative Second Amended Complaint, Hildene alleges that the ***FDIC "cross-guarantee existed because Union Bank had a sister bank, First National Bank of Olathe,***

***which had been placed in receivership and its liabilities assumed by another institution sold by the FDIC. This resulted in the FDIC having a lien of approximately $116.6 million on Union Bank's assets.***" ECF No. 58 at ¶ 38.

27. On August 12, 2016, Hildene served the expert report of its valuation "expert," Paul Huygens. The objective of Mr. Huygens' report was to determine what Union Bank "would fetch in an open and fair" bankruptcy process, had the Union Bank Transaction never occurred and had the assets of Union Bank been sold off in connection with a bankruptcy filing by Bannister. (ECF No. 162-4.) For purposes of his analysis, Mr. Huygens was instructed by Hildene to ignore the FDIC Cross Lien, such that any and all money generated in a bankruptcy process would go to Bannister's creditors and not to the FDIC. Notwithstanding this instruction, Mr. Huygens acknowledged in his report and at his deposition "there would be no value at all for anybody but the FDIC" if the Cross Lien was enforced. (ECF No. 151-18 at 174:8-9.)

28. Mr. Huygens opined in his valuation report that Union Bank had a fair market value of $5.5 million at the time of the Union Bank Transaction. Thus, under Hildene's theory, even if the Union Bank Transaction had never occurred, the Bannister TruPS holders would have received, at most, $5.5 million (assuming that every cent generated through a bankruptcy process would be distributed to the TruPS holders).

29. On September 12, 2016, Arvest Bank served the expert report of Mr. Santomero. A copy is attached hereto as Exhibit A (which includes a copy of Mr. Santomero's CV as Appendix A). Among other things, in his over forty years of experience in the financial and banking sectors, Mr. Santomero has previously served as the President and CEO of the Federal Reserve Bank of Philadelphia, and currently serves as a member of the Boards of Directors of Citigroup

and Citibank, NA (among others) and as Richard K. Mellon Professor Emeritus of Finance at the Wharton School at the University of Pennsylvania.

30.   In his report, Mr. Santomero opines that that the Bannister TruPS had no economic value at the time of the Union Bank Transaction, and that U.S. Bank (as holder of the Bannister TruPS) would never have received any payments on the TruPS even if the Union Bank Transaction had not occurred.  This is because (i) Union Bank, in its rapid descent toward inevitable failure, would never have been able to provide Bannister the upstream dividends necessary to pay the TruPS holders – even ignoring the FDIC Cross Lien; and (ii) the FDIC Cross Lien would have consumed Union Bank's capital reserves and assets and foreclosed the possibility of Union Bank issuing any upstream dividends to Bannister to be used to pay the TruPS obligations – even if Union Bank were capable of generating such dividends (which it was not).

## LAW AND ARGUMENT

The use of expert testimony is governed by Federal Rule of Evidence 702.  *Honsinger*, 2007 U.S. Dist. LEXIS 84350, at *2; *see also* FED. R. EVID. 702.  This rule permits "the use of specialized knowledge if it will 'assist the trier of act to understand the evidence or to determine a fact in issue, but only if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Honsinger*, 2007 U.S. Dist. LEXIS 84350, at *2-3.  "The rejection of expert testimony is the exception rather than the rule." *In re Nuvaring Prods. Liab. Litig.*, Case No. 4:08-MD-1964-RWS, 2013 U.S. Dist. LEXIS 31027, at *60 (E.D. Mo. March 5, 2013).

As this Court has emphasized, as part of their gatekeeping function, "district courts should not purport to resolve which expert's opinion is 'better' or confuse matters of

impeachment with matters of admissibility." *Honsinger*, 2007 U.S. Dist. LEXIS 84350, at *2-3. And the Eighth Circuit Court of Appeals has stressed that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility . . . . [O]nly if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Larson*, 414 F.3d at 941 (citations omitted); *Honsinger*, 2007 U.S. Dist. LEXIS 84350, at *2-3; *A.H. v. St. Louis County*, Case No. 4:14-CV-2069, 2016 U.S. Dist. LEXIS 107487, at *9 (E.D. Mo. Aug. 15, 2016) (denying *Daubert* motion where movant "contest[ed] the accuracy of the factual bases" underlying an expert's opinion). Under this standard, Hildene's motion should clearly be denied.

### A. Mr. Santomero's reliance on the FDIC Cross Lien is entirely appropriate.

Arvest Bank's summary judgment motions are currently pending before this Court. *See* ECF Nos. 121 & 151. As demonstrated clearly in Arvest Bank's moving papers, there is no genuine issue of material fact that U.S. Bank (Hildene's purported assignor and the holder of the Bannister TruPS) has not and could never prove that it has suffered damages as a result of Arvest Bank's alleged "tortious interference." Specifically, the FDIC Cross Lien is fatal to U.S. Bank's claim because it undisputedly would have consumed Union Bank's capital reserves and assets and foreclosed the possibility of Union Bank issuing any upstream dividends to Bannister to be used to pay the TruPS obligations. Because U.S. Bank would not have been paid even absent the purported tortious interference with the underlying Indenture, its claim must fail. *See Mueller v. Abdnor*, 972 F.2d 931, 938 (8th Cir. 1992) (tortious interference claim must fail unless plaintiff can show that "the party defaulting was ready, able and willing to perform and would have done so if it had not been prevented or persuaded by the malicious and unwarranted interference of a third party").

- 10 -

Case 4:14-cv-01110-ODS   Document 167   Filed 12/05/16   Page 11 of 15

In its *Daubert* motion, Hildene argues that Mr. Santomero has improperly relied on the FDIC Cross Lien and contends that the FDIC lacked "legal authority to assess cross-lien liability" against the assets of Union Bank. This is a brand new argument from Hildene – and one that contradicts its prior representations to regulators and this Court. In its April 13, 2012 letter to the Arkansas State Bank Department, Hildene acknowledged the existence and applicability of the FDIC Cross Lien. Hildene did the same in the Second Amended Complaint filed with this Court on August 7, 2015. *Supra* at ¶ 26 ("This resulted in the FDIC having a lien of approximately $116.6 million on Union Bank's assets."). But now – in an apparent effort to avoid summary judgment and create a material issue of fact simply through self-contradiction – Hildene for the first time contends that the FDIC Cross Lien was ineffective.

Hildene's new argument is plainly implausible. The existence and applicability of the FDIC Cross Lien is not in doubt – it is a matter of public record reflected in numerous FDIC orders and reiterated by the FDIC to the relevant parties at the October 7, 2011 meeting in the FDIC's Kansas City office. If Hildene wishes to argue – however implausibly – against the applicability of the FDIC Cross Lien, it will have the opportunity to do so in response to Arvest Bank's pending summary judgment motion.[2] For purposes of this *Daubert* motion, however,

---

[2] As a legal matter, Hildene's interpretation of the federal statutory scheme is clearly wrong. Section 12 USC 1815(e)(1)(A) grants the FDIC authority to assess a cross guaranty against a bank "in connection with the default of a ***commonly controlled*** insured depository institution." 12 U.S.C. § 1815(e)(1)(A)(i). A company has "common control" over a bank if the company "directly ***or indirectly*** . . . owns, controls, or has power to vote 25 per centum or more of any class of voting securities of the bank or company." 12 U.S.C. § 1841(a)(2). Here, it cannot be disputed that First Olathe Bancshares controlled both First National Bank of Olathe (directly) and Union Bank (indirectly, through its direct control of Bannister). Hildene's new argument to the contrary is simply wrong. Moreover, Hildene's new argument is inconsistent with the United States Supreme Court's holding in *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), in which the Supreme Court held that agencies like the FDIC are entitled to substantial deference in interpreting and applying federal statutes (like the federal cross-guaranty statute from which the FDIC's authority to assess cross-guaranties is derived). Finally, in light

- 11 -

Mr. Santomero's reliance on the FDIC Cross Lien is only improper if it "is so fundamentally unsupported that it can offer no assistance to the jury." *Larson*, 414 F.3d at 941; *see also Bailey v. Golden State Food Corp.*, Case No. 4:14-CV-1631-RLW, 2016 U.S. Dist. LEXIS 106851, at *4 (E.D. Mo. Aug. 12, 2016) (denying motion to exclude expert testimony over movant's argument that expert had "hand-picked facts" to support opinion). Here, Hildene's new, last-ditch argument does not render Mr. Santomero's reliance on the FDIC Cross Lien to be "fundamentally unsupported," and Hildene's *Daubert* motion accordingly fails.

B. **Mr. Santomero is qualified to render a valuation opinion.**

Hildene also offers a "kitchen sink" objection to Mr. Santomero's testimony, arguing that certain parts of his testimony are unreliable or otherwise improper for a variety of reasons. *See, e.g.*, Motion at p. 8 (arguing that Mr. Santomero is not an expert in Section 363 sales); *id.* (arguing that Mr. Santomero had not read a transcript of proceedings before the Arkansas State Bank Department); *id.* at p. 9 (arguing that Mr. Santomero has no "pertinent" valuation experience). These kitchen sink arguments clearly go to weight, not admissibility, and Hildene's motion should be denied.

Mr. Santomero has more than forty years of experience as an economist in the banking and finance industries. A review of his CV exposes how nonsensical Hildene's motion is. *See* Exhibit A at Appendix A. A Ph.D. economist, Mr. Santomero served for decades as a professor of finance at the distinguished Wharton School of the University of Pennsylvania. Among his many additional accomplishments, he was a President and CEO of the Federal Reserve Bank of Philadelphia. He is currently Professor Emeritus at Wharton and serves as a director of a number of financial institutions, including Citigroup and Citibank. His 150 publications include writings

---

of its prior representations to the regulators and to this Court, Hildene may be estopped from now contesting the enforceability of the FDIC Cross Lien in a transparent effort to create material questions of fact to defeat summary judgment.

directly relevant to the Union Bank Transaction, the value of the Bannister TruPS and bankruptcy issues. *See* Appendix A at "Professional Publications." In light of this vast experience, Hildene's objections to certain portions of Mr. Santomero's testimony simply go to the weight the jury will ultimately afford his opinions, and not to their admissibility. *See, e.g.*, *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (holding that purported "gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility").

## CONCLUSION

For these reasons, Arvest Bank respectfully requests that this Court deny Hildene's *Daubert* motion in its entirety.

Respectfully submitted,

Dated: December 5, 2016

**/s/ Michael S. Cargnel**
SHOOK, HARDY & BACON L.L.P.
Michael S. Cargnel
mcargnel@shb.com
Jenna Sheldon-Sherman
jsherman@shb.com
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
Fax: (816) 421-5547

SQUIRE PATTON BOGGS (US) LLP
Joseph C. Weinstein (admitted *pro hac vice*)
joe.weinstein@squirepb.com
Sean L. McGrane (admitted *pro hac vice*)
sean.mcgrane@squirepb.com
4900 Key Tower, 127 Public Square
Cleveland, OH 44114
Tel: (216) 479-8500

*Attorneys for Defendant Arvest Bank*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record through this Court's Electronic Case Filing system, and by electronic mail, this 5th day of December 2016.

/s/ Michael S. Cargnel