# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

HILDENE OPPORTUNITIES MASTER )
FUND, LTD. )
                                      )     Case No. 4:14-cv-01110-ODS
           Plaintiff, )
                                      )
v. )
                                      )
ARVEST BANK, *et al.* )
                                      )
          Defendants. )

## DEFENDANT ARVEST BANK'S REPLY SUGGESTIONS
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

SQUIRE PATTON BOGGS (US) LLP
Joseph C. Weinstein (admitted *pro hac vice*)
joe.weinstein@squirepb.com
Sean L. McGrane (admitted *pro hac vice*)
sean.mcgrane@squirepb.com
4900 Key Tower, 127 Public Square
Cleveland, OH 44114
Tel: (216) 479-8500
Fax: (216) 479-8780

*Attorneys for Defendant Arvest Bank*

SHOOK, HARDY & BACON L.L.P.
Michael S. Cargnel
mcargnel@shb.com
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
Fax: (816) 421-5547

*Attorney for Defendant Arvest Bank*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

    A.    Bannister did not breach the Successor Obligor Clause ...................................... 1

        1.    The express terms of the Successor Obligor Clause are unambiguous and dispositive .................................................... 1

        2.    Hildene does not cite a single case in which a successor obligor provision is applied to unmentioned subsidiaries ...................................... 4

    B.    Hildene points to no specific facts showing that Arvest Bank acted improperly in the Union Bank Transaction ........................................................ 5

    C.    Hildene's argument for "damages" is based on pure speculation and fantasy .......................................................................................................... 9

        1.    The FDIC Cross Lien was valid................................................................ 9

        2.    Hildene cannot avoid summary judgment through speculation about an imaginary bankruptcy process or alternative buyer .................. 13

    D.    U.S. Bank's claims are barred by the doctrines of equitable estoppel and waiver........................................................................................................ 14

CONCLUSION.................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of N.Y. Trust Co. v. Franklin Advisers, Inc.*,
  726 F.3d 269 (2d Cir. 2013)............................................................................2

*In re BankAtlantic Bancorp. Litig.*,
  39 A.3d 824 (Del. Ch. 2012).....................................................................2, 4, 5

*Branch v. U.S.*,
  69 F.3d 1571 (Fed. Cl. 1995)....................................................................11, 12

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984)................................................................................12, 13

*Clinch v. Heartland Health*,
  187 S.W.3d 10 (Ct. App. Mo. 2006) ............................................................5, 8

*Fifth Third Bank of W. Ohio v. U.S.*,
  55 Fed. Cl. 372 (Fed. Cl. 2003) ...................................................................11

*Frederick v. Benson Aircraft Corp.*,
  436 S.W.2d 765 (Mo. App. 1968) .................................................................8

*Gaff v. FDIC*,
  919 F.2d 384 (6th Cir. 1990) .......................................................................12

*Girffioen v. Cedar Rapids & Iowa City Ry. Co.*,
  785 F.3d 1182 (8th Cir. 2015) .....................................................................13

*Kennedy v. Gish, Sherwood & Friends, Inc.*,
  143 F. Supp. 3d 898, 914 (E.D. Mo. 2015).....................................................1

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
  595 F.3d 458 (2d Cir. 2010)........................................................................2, 4

*Mann v. Yarnell*,
  497 F.3d 822 (8th Cir. 2007) .........................................................................1

*Sharon Steel Corp. v. Chase Manhattan Bank*,
  691 F.2d 1039 (2d Cir. 1982).......................................................................2, 3

*Speedie Food Mart, Inc. v. Taylor*,
  809 S.W.2d 126 (Mo. Ct. App. 1991)............................................................15

Case 4:14-cv-01110-ODS   Document 181   Filed 01/04/17   Page 3 of 21

*Swarts v. Siegel,*
    117 F.13 (8th Cir. 1902) ...................................................................................1

*TCA TV Corp. v. McCollum,*
    839 F.3d 168 (2d Cir. 2016)..........................................................................1

**Statutes**

Bank Holding Company Act, 12 U.S.C. § 1841 ........................................................11

Federal Deposit Insurance Act, 12 U.S.C. § 1811, *et seq.*.........................................10

Case 4:14-cv-01110-ODS   Document 181   Filed 01/04/17   Page 4 of 21

<u>**PRELIMINARY STATEMENT**</u>

The Eighth Circuit has made clear that a party cannot avoid summary judgment by relying on "mere speculation, conjecture, or fantasy," *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007), yet that is precisely what Hildene attempts to do here. The undisputed facts, however, show that there are no genuine issues left for trial, and summary judgment should accordingly be granted for Arvest Bank.

**A.      Bannister did not breach the Successor Obligor Clause.**

Hildene does not dispute that the first and most basic element of a tortious interference with contract claim is an underlying breach of contract. Thus, if Bannister did not breach the Successor Obligor Clause,[1] the tortious interference claim fails.

**1.      The express terms of the Successor Obligor Clause are unambiguous and dispositive.**

The law in New York and in this Circuit is clear: "[T]he best evidence of the parties' intent is the language used in their contract. Thus, where contract language is clear and unambiguous, courts will enforce an agreement according to its terms, without looking outside the four corners of the document." *TCA TV Corp. v. McCollum*, 839 F.3d 168, 188 (2d Cir. 2016); *see also Swarts v. Siegel*, 117 F.13, 18-19 (8th Cir. 1902).[2] Contrary to Hildene's

_____

[1] In the Second Amended Complaint ("SAC"), Hildene asserts two counts for breach of contract against Bannister: (i) breach of the Successor Obligor Clause (Count Two) and (ii) breach of Section 5.1(a) of the Indenture requiring the timely payment of interest (Count Three). The ***only*** breach that Arvest Bank is alleged to have caused through its "tortious interference" is the alleged breach of the Successor Obligor Clause; there are no allegations whatsoever in the SAC that Arvest Bank caused Bannister to breach Section 5.1(a) of the Indenture, and Hildene cannot amend the SAC through arguments made in its briefing. *See, e.g.,* SAC at ¶¶ 5, 27, 43, 46; *see also Kennedy v. Gish, Sherwood & Friends, Inc.*, 143 F. Supp. 3d 898, 914 (E.D. Mo. 2015). Thus, the question of whether or not Bannister breached Section 5.1(a) of the Indenture is irrelevant to the tort claim asserted against Arvest Bank.

[2] Hildene does not dispute the choice-of-law analysis in Arvest Bank's Suggestions in Support of Summary Judgment, ECF No. 151 at pp. 19-20, and therefore Arvest Bank respectfully submits

argument in its Opposition Suggestions (the "Opposition"), there is nothing mystical about indentures or successor obligor clauses that disqualify them from being construed according to this basic principle. Indeed, in one of the cases upon which Hildene relies, the Second Circuit made clear that courts should not "import[] a meaning" into a successor obligor provision that is "not evident in the language." *Sharon Steel Corp. v. Chase Manhattan Bank*, 691 F.2d 1039, 1049 (2d Cir. 1982);[3] *see also Bank of N.Y. Trust Co. v. Franklin Advisers, Inc.*, 726 F.3d 269, 276 (2d Cir. 2013) ("It is a well-established rule . . . that the interpretation of indenture provisions is a matter of basic contract law.").

Here, the language of the Indenture is clear and unambiguous – it applies only to the sale of property by Bannister and does not apply to the sale of property by any Bannister subsidiary (like Union Bank). *See* ECF No. 151 at pp. 21-23. Hildene spends pages of its Opposition straining to create an ambiguity in this language, but Hildene fails. Whether a contract is ambiguous is a question of law for the Court to decide. *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010). In determining whether a contract's terms are ambiguous, a court may consider custom and usage. *Id.* at 466-68. Here, even the cases relied upon by Hildene recognize the American Bar Association's *Commentaries* as the definitive resource in construing indenture provisions as they are customarily used and drafted by market participants. *See In re BankAtlantic Bancorp. Litig.*, 39 A.3d 824, 837-38 (Del. Ch.

---

that Arkansas law should govern U.S. Bank's claim for tortious interference. Furthermore, Arvest Bank agrees with Hildene that even if Arkansas law governs, the first element of U.S. Bank's claim (whether Bannister breached the Indenture) should be decided by reference to New York law, since the Indenture contains a New York choice-of-law provision. In any event, the relevant principles of contract interpretation are identical in New York and in this Circuit: An unambiguous contract should be interpreted and enforced according to its plain terms.

[3] *Sharon Steel* also directly undercuts Hildene's argument that the question of whether Bannister breached the Successor Obligor Clause cannot be determined as a matter of law. *See* Opp. at p. 21. The Second Circuit made clear that the interpretation of a successor obligor clause is "a matter of law rather than fact" that should not be left to a jury. *Sharon Steel*, 691 F.2d at 1048.

2012) ("[T]he authoritative commentary on indenture provisions begins with [*Commentaries*] . . . [which] provide powerful evidence of the established commercial expectations of practitioners and market participants."); *Sharon Steel*, 691 F.2d at 1048-49.

The *Commentaries* unequivocally dispel any argument that the language of the Successor Obligor Clause here is ambiguous, or that the parties to the Indenture never could have intended to allow Union Bank to sell its assets without triggering the Successor Obligor Clause. The *Commentaries* make clear that an indenture intended to restrict the sale of the issuing company's subsidiary's assets will include clear, express language to that effect:

> Indenture provisions which are made applicable to the consolidated activities of the Company ***and certain of its subsidiaries would usually include provisions which restrict the consolidation or merger of such subsidiaries and the disposition of their assets as an entirety or substantially as an entirety*** . . . Sample Covenant 5 illustrates one relatively simple way in which such activity by subsidiaries may be restricted.

*See* attached Ex. UU at p. 426.[4] Sample Covenant 5, in turn, contains language expressly restricting a subsidiary's ability to convey its property: "The Company shall not permit any subsidiary to . . . (c) convey or transfer its properties as an entirety or substantially as an entirety . . . ." Ex. SS.

Here, the Successor Obligor Clause in the Indenture **undisputedly does not** contain any language restricting the sale or transfer of Union Bank's property. Hildene would have this Court interpret the absence of any such language as an ambiguity. But the *Commentaries* and basic canons of contract interpretation make clear that the absence of any such language should be interpreted as a manifestation of the parties' intent to exclude Union Bank's assets from the scope of the Successor Obligor Clause – especially where, as here, the parties expressly referenced Bannister's "subsidiaries" in other parts of the Indenture. *See* Ex. A at § 3.10. Thus,

---

[4] Exhibits UU and VV are attached to this brief. All other citations to "Ex." are to exhibits filed in support of Arvest Bank's opening suggestions (ECF No. 151).

because the express terms of the Successor Obligor Clause are unambiguous, Arvest Bank respectfully submits that it should be enforced as written and Hildene's speculation regarding the parties' unexpressed intent should be ignored. *See Law Debenture Trust Co.,* 595 F.3d at 468 ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.").[5]

### 2. Hildene does not cite a single case in which a successor obligor provision is applied to unmentioned subsidiaries.

Hildene cites cases involving indentures and successor obligor clauses, and claims that they are relevant here. Opp. at pp. 21-23; *see also* Opposition to Bannister Motion (ECF No. 172) at pp. 15-18. These cases are inapposite because they involve the sale of property by the company that is expressly mentioned in the governing indenture; none involves the sale of property by an unnamed, unmentioned subsidiary.

Hildene continues to rely principally on *BankAtlantic*. There, Defendant BankAtlantic Bancorp., Inc. ("Bancorp") was a bank holding company that owned 100% of the shares of BankAtlantic, a federal savings bank. 39 A.3d at 826. The indenture in *BankAtlantic* contained language similar to the indenture here, prohibiting Bancorp from selling or conveying substantially all of its property unless the purchaser assumed Bancorp's TruPS. *Id.* at 828-29. Bancorp then negotiated and entered into an agreement to sell *its own property* – the stock of BankAtlantic – to a third-party purchaser. *Id.* at 835. Unlike here, Bancorp's subsidiary, BankAtlantic, did not sell any of its assets. Thus, the transaction in *BankAtlantic* (where the bank holding company sold its own property and the subsidiary bank sold nothing) is entirely

---

[5] Hildene's cursory argument that the term "property" is ambiguous and should be read to mean "the value of the property" or to also include Union Bank's property, Opp. to Bannister Motion at p. 17, would require this Court to impermissibly insert terms into the Successor Obligor Clause. Again, the *Commentaries* show that the parties could have easily written the Successor Obligor Clause to encompass Union Bank's assets but undisputedly did not do so. That is dispositive.

different from the Transaction here – where the bank holding company (Bannister) sold nothing and the subsidiary (Union Bank) sold its assets directly to Arvest Bank.

Because the transaction in *BankAtlantic* is unlike the Union Bank Transaction, Hildene's lengthy discussion of the "qualitative" and "quantitative" factors applied in *BankAtlantic* is irrelevant. Opp. at 22. In *BankAtlantic,* after making the threshold determination that the successor obligor provision was implicated by its express terms, the Delaware Chancery Court then applied these factors to determine whether "substantially all" of Bancorp's property was being sold. 39 A.3d at 841-43. The Delaware Chancery Court applied these factors *only after* it determined that the language of the indenture applied to the sale of the holding company's property. Here, in an effort to confuse the issue, Hildene skips right past the threshold determination of whether the language of the Successor Obligor Clause applies by its own terms and goes right to the qualitative and quantitative factors. But this is a red herring: The question in this case is not whether "substantially all" of Union Bank's property was conveyed to Arvest Bank. The question is whether the Indenture prohibits the conveyance of Union Bank's property at all – and clearly, it does not. *BankAtlantic* is inapposite.[6]

### B.     Hildene points to no specific facts showing that Arvest Bank acted improperly in the Union Bank Transaction.

To survive summary judgment, Hildene must point to specific facts sufficient to raise a triable issue as to whether Arvest Bank acted improperly in causing Bannister to breach the Successor Obligor Clause. *See* ECF No. 151 at 23-25.[7] In an effort to satisfy this element,

---

[6] The other cases cited by Hildene are inapposite for the same reason – they do not involve the sale of property by the company's unmentioned subsidiaries.

[7] Hildene argues that it need not show improper means under Missouri law. Opp. at p. 26. This argument fails for several reasons. First, as stated in Arvest Bank's opening suggestions, Arkansas law applies here and undisputedly requires a plaintiff to demonstrate improper means. ECF No. 151 at pp. 19-20, 23. Second, although there is admittedly some confusion in the case

Hildene peppers the Opposition with baseless innuendo and unsupported allegations – none of which creates genuine issues of material fact. For example:

- With no supporting factual citation, Hildene characterizes the Union Bank Transaction as a "backroom deal." Opp. at p.1. This is nonsensical – the undisputed evidence shows that the Transaction was negotiated at arm's length and was then reviewed and approved by the Federal Reserve Bank of St. Louis, the Missouri Division of Finance and the Arkansas State Bank Department. ECF No. 151 at pp. 15-17. This was not a "backroom deal."

- Hildene repeatedly states that Arvest Bank "paid $1" for the assets of Union Bank. *See, e.g.,* Opp. at pp. 2, 10. This is patently misleading because it ignores that Arvest Bank assumed approximately $407 million of Union Bank's liabilities – $405 million of which was money owed to Union Bank's depositors. ECF No. 151 at p. 12 (¶ 34). In fact, the liabilities assumed ultimately exceeded the value of the assets purchased by approximately $39 million, which Arvest Bank was forced to book as good will (which is booked when the purchase price of an asset exceeds the value acquired). *Id.* at p. 12 (¶¶ 33-34).

- Hildene writes that Union Bank and Bannister executives were principally concerned "with preserv[ing] jobs for [their] own executives." Opp. at p. 3. But Hildene never identifies any of these anonymous executives, and the undisputed evidence shows that the Union Bank board (which approved the Union Bank Transaction) was motivated primarily to avoid the bank's collapse. *See* attached Ex. VV at 175:4-8. Moreover, Hildene ignores that the Union Bank Transaction actually saved the jobs of hundreds of Union Bank employees in this area – many of whom are still working for Arvest Bank today. ECF No. 151 at p. 17 (¶ 57).

In addition to this baseless innuendo, Hildene attempts to raise questions of material fact by arguing that Arvest Bank's counsel made misrepresentations to the Arkansas State Bank Department at a hearing on April 19, 2012. Hildene argues that Arvest Bank's counsel (i) misleadingly implied that U.S. Bank "had blessed" the Union Bank Transaction and (ii) "falsely" represented that Arvest Bank was confident that "there was no real risk of liability on the TruPS." Opp. at p. 24. Notably, Hildene avoids actually citing to the transcript of the hearing,

---

law, recent decisions in Missouri have held that a plaintiff must show improper means in all tortious interference cases. *See Clinch v. Heartland Health*, 187 S.W.3d 10, 16 (Ct. App. Mo. 2006) ("Courts since [the Missouri Supreme Court's decision in] *Nazeri* have interpreted that case to mean that plaintiffs must allege and prove in all tortious interference cases that the defendant employed improper means."). Third, even if Missouri law applies and does not require the showing of improper means, Hildene would still be required to prove that Arvest Bank lacked any justification in entering into the Transaction, which Hildene cannot do.

which was produced in discovery and submitted to this Court in full as an exhibit to Arvest

Bank's summary judgment motion. *See* Ex. LL. The transcript shows that, in response to a

Commissioner's question regarding letters from Hildene, Arvest Bank's counsel stated:

> Hildene Capital is a venture capital firm that deals in distressed securities. They're the ones that have written the letters. But we've also been in correspondence with the trustee who holds the debentures and issues trust preferred in a securitized mechanism of these interests.

> We – all of us in this firm, other lawyers for Arvest, we're all confident there's no real risk of anyone prevailing on these 25 million worth of debentures against the bank or the holding company or Arvest. It's just not there. And they're disappointed and surprised probably.

> …

> But anyway, we feel good about it, but you can't – you know, you can't be sure someone won't try to file a lawsuit or an injunction. And if that happens, we'll deal with it.

Ex. LL at 19:21 – 20:20.

There are no facts in evidence to show that any part of this statement is false or

misleading. As is plainly evident from the hearing transcript, counsel for Arvest Bank never

stated or implied that U.S. Bank "had blessed" the Union Bank Transaction; rather, counsel

simply stated that there had been correspondence with U.S. Bank regarding the Transaction,

which is undisputedly true. *See* Ex. II (letter from U.S. Bank to Bannister dated March 2, 2012,

inquiring about Union Bank Transaction); Ex. M (letter from Bannister's counsel to U.S. Bank

dated March 21, 2012. Counsel's statement that Arvest Bank's lawyers were "confident there's

no real risk of anyone prevailing on these 25 million worth of debentures" is also clearly not a

misrepresentation: It is an accurate description of Arvest Bank's opinion (then and now) that the

Union Bank Transaction does not constitute a breach of the Indenture.[8] This statement of

---

[8] Hildene suggests this statement was misleading because Arvest Bank secured an indemnification from Bannister against any claims arising out of the TruPS. But the undisputed

opinion is not a misrepresentation. *See, e.g., Frederick v. Benson Aircraft Corp.*, 436 S.W.2d 765, 770 (Mo. Ct. App. 1968) ("[A] statement of what the law will or will not allow to be done is a matter of opinion . . . ."). And, in any event, the Arkansas State Bank Department was clearly aware that others objected to the Transaction: It was in possession of two detailed letters from Hildene objecting to the Transaction, Exs. FF and HH, and Arvest Bank's counsel expressly referenced the possibility of litigation. Thus – as with all of Hildene's arguments – the idea that Arvest Bank pulled the wool over the eyes of the Arkansas State Bank Department is pure fantasy.

Finally, Hildene argues that Arvest Bank "coerced" Union Bank into entering into the Union Bank Transaction. Opp. at pp. 25-26. This argument, too, has no support in the record, and in fact was expressly denied by one of Union Bank's former directors:

Q: [W]as Union trying to negotiate the best deal it had available to it?

…

A. Absolutely. I mean, we wanted to get the best deal we could given the impaired state of the bank, that we didn't have a lot of leverage but trying to do the best we could.

Q. By the same, taken, Union wasn't compelled to enter into any deal with anybody at this point in time, was it . . . [I]f it didn't like the Arvest deal, it didn't have to do a deal with Arvest []?

A. No. I mean, we had free will.

*See* attached Ex. VV at 175:10 – 176:1.

In sum, there is no genuine issue of material fact regarding the propriety of Arvest Bank's conduct in the Union Bank Transaction, and summary judgment is therefore appropriate.

---

record shows that Arvest Bank obtained the indemnification one month *after* this hearing and *after* Hildene had threatened litigation. Ex. B at 89:3-9. Moreover, Arvest Bank obtained the indemnification "to get as much protection as we could," not because it believed the claims threatened by Hildene were meritorious. *Id.* This is standard practice and is not improper.

**C.**    **Hildene's argument for "damages" is based on pure speculation and fantasy.**

To show damages, a plaintiff must prove that "the party defaulting was ready, able and willing to perform and would have done so if it had not been prevented or persuaded by the malicious and unwarranted interference of a third party."  ECF No. 151 at p. 25.  Thus, to survive summary judgment, Hildene must point to specific facts that show not just that Bannister did not pay on the TruPS, but that Bannister *would have paid* but for Arvest Bank's "interference."  *Id.*  Hildene cannot do so.

**1.**    **The FDIC Cross Lien was valid.**

Hildene does not dispute that Bannister's ability to pay its TruPS was entirely dependent on Union Bank's ability to generate and pay upstream dividends to Bannister.  Nor does Hildene dispute that the $120 million priority FDIC Cross Lien would have consumed Union Bank's capital reserves and foreclosed the possibility of Union Bank ever issuing any upstream dividends to Bannister, thereby rendering the TruPS worthless.  *Id.* at pp. 25-27.   Indeed, Hildene cannot dispute this because its own expert admitted as much: "It would mean there's no value at all for anybody but the FDIC."  Exhibit W at 174:2-9.  Thus, if the FDIC Cross Lien was valid, Hildene undisputedly cannot show damages and summary judgment should be granted.

No one – not the FDIC, not Union Bank, not Bannister, not U.S. Bank, not any regulatory body that approved the Union Bank Transaction – has ever questioned the validity of the FDIC Cross Lien, which was assessed after the failure of Union Bank's sister bank, the First National Bank of Olathe.  *See* Exhibit R. at p. 1 of Order.  In fact, over the last four years, Hildene itself has repeatedly recognized the validity and enforceability of the FDIC Cross Lien – including in the Second Amended Complaint.  *See* SAC at ¶ 58; *see also* Ex. HH (April 13, 2012 letter from Hildene to the Arkansas State Bank Department acknowledging risk of insolvency "as a result of the FDIC enforcing its cross guaranty liability").  Then, six weeks ago – the same day Arvest

Bank filed its summary judgment motion – Hildene (in a *Daubert* brief) argued for the first time that the FDIC Cross Lien was invalid. ECF Nos. 148 & 149. Hildene's argument is that Union Bank and the First National Bank of Olathe were not "commonly controlled," and thus the FDIC lacked authority to assess the Cross Lien. Opp. at pp. 29-30. This argument is contradicted by the undisputed law and facts.

Hildene does not dispute that FirstOlathe Bancshares, Inc. ("FOBI") was a multibank holding company that controlled three direct subsidiaries: (i) Bannister, [9] (ii) First National Bank of Olathe and (iii) First National Bank of Scottsdale. *See* Ex. J at ¶¶ 4-5, 28-29; Ex. VV at 34:8-14; Ex. R at p. 1 of Order; Ex. S. Union Bank, in turn, was a majority-owned direct subsidiary of Bannister and an indirect subsidiary of FOBI:



**Corporate Structure of First Olathe Bancshares** [1]

When the First National Bank of Olathe failed on August 12, 2011, the FDIC imposed the Cross Lien against the assets of Union Bank pursuant to the Federal Deposit Insurance Act,

[9] Hildene cites an excerpt from the deposition of Bannister's 30(b)(6) deponent for the proposition that "Bannister does not have a parent company." Opp. at ¶ 18. The witness actually testified that he did not understand the legal ramifications of the term "parent company" but knew that FOBI "owned an interest in Bannister. . . ." *See* attached Ex. VV at 34:18 – 35:9.

12 U.S.C. § 1811, *et seq.* *See* Exhibit R at p. 1 of Order. That Act authorizes the FDIC to assess cross guaranty liability "in connection with the default of a *commonly controlled* insured depository institution." 12 U.S.C. § 1815(e)(1)(A)(i) (emphasis added). The "Definitions" section of the Federal Deposit Insurance Act (which Hildene ignores in the Opposition) states that "the term 'control' has the meaning given to such term in section 1841 of this title." 12 U.S.C. § 1813(w)(5). Section 1841 of Title 12, in turn, is the Bank Holding Company Act, which defines "control" as follows:

> Any company has control over a bank or over any company if – (A) the company *directly or indirectly* or acting through one or more other persons owns, controls, or has power to vote 25 per centum or more of any class of voting securities of the bank or company.

12 U.S.C. § 1841(a)(2)(A) (emphasis added). Thus, for purposes of assessing cross guaranty liability, a bank holding company has "common control" over banks or depository institutions if it *directly or indirectly* owns or controls those banks. *Id.*

Here, the undisputed facts show that FOBI commonly controlled both First National Bank of Olathe and Union Bank. FOBI *directly* owned and controlled First National Bank of Olathe, and FOBI *indirectly* owned and controlled Union Bank through its direct majority ownership and control of Bannister. *See* Exs. J, R & S (reflecting that FOBI owned 60.81% of Bannister and Bannister owned 97.54% of Union Bank). Thus, First National Bank of Olathe and Union Bank were "commonly controlled" because they were controlled (directly and indirectly) by the "same company" – FOBI. *See* 12. U.S.C. § 1815(e)(8).[10]

---

[10] Hildene cites *Branch v. U.S.*, 69 F.3d 1571, 1574 (Fed. Cl. 1995) as "pertinent case law" regarding the federal cross guaranty provisions. (Hildene also cites *Fifth Third Bank of W. Ohio v. U.S.*, 55 Fed. Cl. 372 (Fed. Cl. 2003), which simply refers back to *Branch*). *Branch* is a Fifth Amendment takings case that does not in any way hold or even suggest that a bank holding company only "controls" its direct subsidiaries but not its indirect subsidiaries. To the contrary – the court in *Branch* recognized that the federal cross guaranty provisions are meant to be applied broadly to all subsidiary banks within a holding company's "system": "[A] single bank holding

Moreover, even if the plain text of these federal statutes were ambiguous (and it is not), the FDIC's contemporaneous interpretation and application of them would be dispositive. The Supreme Court has long recognized that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . ." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). And here, the undisputed factual record clearly shows that the FDIC forcefully asserted the Cross Lien prior to the Union Bank Transaction. At an October 7, 2011 meeting at its offices in Kansas City, the FDIC made clear to representatives of Union Bank and Arvest Bank that its Cross Lien had priority over all other creditors or claims. Ex. E at 47:10-18. And Hildene simply ignores the FDIC Order dated June 19, 2012 that (i) acknowledged that the Cross Lien had been assessed upon the failure of the First National Bank of Olathe, (ii) cited the statutory authority by which the Cross Lien had been assessed and (iii) waived the Cross Lien so as to facilitate the closing of the Union Bank Transaction. Ex. R. Clearly, the FDIC – the entity created by Congress to administer and enforce the Federal Deposit Insurance Act – construed the Cross Lien to be valid, and Hildene has elicited no facts in discovery (from the FDIC or

---

company, unlike unrelated banks and the public at large, has some measure of control over the success or failure of the banks *within its system* . . . [H]olding all related banks liable for losses caused by failing banks *within the system* reduces the risk that bank holding companies will favor their successful banks and allow their less successful banks to fail, a 'moral hazard' that is particularly tempting if the profits of the successful banks can be safeguarded, while the losses of the failing ones are underwritten by the Bank Insurance Fund." *Id.* at 1580; *see also Gaff v. FDIC*, 919 F.2d 384, 395 (6th Cir. 1990) (cross-guaranty provision designed to indemnify the FDIC against losses incurred within "the same financial empire"). Hildene's interpretation of the cross-guaranty provisions would promote this moral hazard: It would allow bank holding companies to sequester bad assets in an indirect subsidiary within its system, while at the same time preventing the FDIC from asserting a lien against other banks within the same system. This would clearly undermine the purpose of the cross guaranty provisions.

otherwise) to cast doubt on this construction which is to be accorded substantial deference. *Chevron*, 467 U.S. at 844.[11]

Nevertheless, Hildene argues in the Opposition that "the jury should be given the opportunity to decide" whether the Cross Lien was valid and enforceable. Opp. at p. 30. But given the plain text of the federal cross guaranty statute, and given the FDIC's contemporaneous interpretation and application of its statutory powers, this is not an issue for the jury: Courts have repeatedly made clear that the construction and application of statutes is a question of law to be decided by courts, not by juries, and this case is no different. *See, e.g., Girffioen v. Cedar Rapids & Iowa City Ry. Co.*, 785 F.3d 1182, 1186 (8th Cir. 2015) (interpretation of federal statute is a question of law).

> ### 2. Hildene cannot avoid summary judgment through speculation about an imaginary bankruptcy process or alternative buyer.

Hildene also attempts to show damages by speculating about "at least two ways in which Bannister could have avoided FDIC issues and also not committed a total breach of the TruPS Indenture." Opp. at p. 28. <u>First</u>, Hildene speculates that Bannister could have sold Union Bank's assets for approximately $5 million through a bankruptcy process. Opp. at p. 28. The $5 million dollar valuation is based entirely on the "analysis" performed by Hildene's valuation expert, Paul Huygens. *Id.* Hildene, however, fails to inform the Court that Mr. Huygens ignored the existence and validity of the FDIC Cross Lien for purposes of his valuation. *See* Ex. W at 173:22-25; *see also* Exhibit V. Thus, the speculation that Bannister could have raised $5 million

---

[11] In an attempt to circumvent *Chevron*, Hildene argues in Footnote 11 of the Opposition that its interpretation of the cross guaranty statutory scheme is consistent with the FDIC's prior interpretations. But Hildene's citation to *In the Matter of Advanta Bank* proves nothing. In *Advanta*, the FDIC concluded that cross guaranty liability could be imposed where banks were owned and controlled by the same holding company. Simply because entities directly owned by the same holding company are "commonly controlled" under the statute does not mean that *only* such entities can be commonly controlled.

through a fictional bankruptcy process, and then used every cent raised in that process to pay the TruPS holders, is based entirely on the assumption that the FDIC Cross Lien does not exist. When the Court concludes that the FDIC Cross Lien was valid and enforceable (for the reasons stated above), it should disregard Hildene's bankruptcy theory for the fantasy that it is – as even Mr. Huygens acknowledged at his deposition that "there would be no value at all for anybody but the FDIC" if the Cross Lien was valid. Ex. W at 174:2-9.

Second, Hildene speculates that Union Bank could have found a better deal than what Arvest Bank offered – one in which an imaginary buyer would have (i) paid more than Arvest Bank for the assets of Union Bank, (ii) assumed Union Bank's $400 million + in liabilities and customer deposits and (iii) also assumed the $20 million in Bannister TruPS. Hildene, however, cites no evidence to support this speculation – and in fact the evidence shows that Union Bank (though its investment bank, Hovde) contacted over 50 parties about a potential deal, but none besides Arvest Bank made an offer to purchase the bank or its assets. Ex. M at p. 3.

Hildene's theories about a fictional bankruptcy process or an imaginary buyer are the exact type of "speculation, conjecture, [and] fantasy" that the Eighth Circuit has held to be insufficient to defeat summary judgment. *Supra* at p. 1. Because Hildene cannot point to any *facts* sufficient to show that U.S. Bank suffered damages, summary judgment should be granted.

**D.    U.S. Bank's claims are barred by the doctrines of equitable estoppel and waiver.**

Except for the new argument regarding the FDIC Cross Lien, the arguments in the Opposition are largely the same arguments Hildene made prior to the closing of the Union Bank Transaction. For example, in its April 13, 2012 letter to the Arkansas State Bank Department, Hildene urged the Department to reject the Union Bank Transaction in favor of a bankruptcy process. Ex. HH at pp. 6-7. But Hildene took no steps to enjoin the Union Bank Transaction

and compel a bankruptcy process.  Similarly, Hildene wrote numerous letters to the parties and to various regulators citing *BankAtlantic* and arguing that the Union Bank Transaction would constitute a breach of the Indenture.  *See, e.g.,* Exs. FF & GG.  But again, Hildene took no steps to enjoin the Union Bank Transaction.

The doctrines of equitable estoppel and waiver are meant to prevent "the unfairness of permitting a party to assert rights belatedly if he knew of those rights but took no steps to enforce them until the other party has, in good faith, become disadvantaged by changed conditions." *Speedie Food Mart, Inc. v. Taylor*, 809 S.W.2d 126, 131 (Mo. Ct. App. 1991).  That is precisely what has happened here: Hildene knew of its purported "rights" before the Union Bank Transaction closed, but neither it nor U.S. Bank[12] took any steps to enforce those rights until years after the Transaction closed and Arvest Bank had invested substantial resources in this community.  It would be fundamentally unfair to allow Hildene and U.S. Bank to belatedly assert those rights now.

## CONCLUSION

For these reasons, Arvest Bank respectfully requests that this Court grant summary judgment in its favor.[13]

---

[12] In fact, U.S. Bank stated in a letter only weeks after the Union Bank Transaction closed that it did "not currently intend to take any further actions" in connection with the Union Bank Transaction, *see* Exhibit OO, and in fact took no actions until it purported to assign its claims to Hildene on August 7, 2015 – three and a half years after the Transaction closed.

[13] As stated fully in Arvest Bank's opening suggestions, summary judgment is also appropriate because the assignment between U.S. Bank and Hildene fails under New York's anti-champerty doctrine.  Hildene does not (and cannot) dispute in its Opposition that the Assignment was a naked transfer of the claims asserted in this action and was made expressly and solely for the purposes of maintaining litigation.  It is thus barred under the anti-champerty doctrine.

Respectfully submitted,

Dated: January 4, 2017

**<u>/s/ Michael S. Cargnel</u>**
SHOOK, HARDY & BACON L.L.P.
Michael S. Cargnel
mcargnel@shb.com
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
Fax: (816) 421-5547

SQUIRE PATTON BOGGS (US) LLP
Joseph C. Weinstein (admitted *pro hac vice*)
joe.weinstein@squirepb.com
Sean L. McGrane (admitted *pro hac vice*)
sean.mcgrane@squirepb.com
4900 Key Tower, 127 Public Square
Cleveland, OH 44114
Tel: (216) 479-8500

*Attorneys for Defendant Arvest Bank*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record through this Court's Electronic Case Filing system, this 4th day of January 2017.


/s/ Michael S. Cargnel