UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| HILDENE OPPORTUNITIES MASTER FUND, LTD., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 4:14-cv-01110-ODS |
| ARVEST BANK, *et al.*, | ) ) ) |
| Defendants. | ) |

# DEFENDANT BANNISTER BANCSHARES, INC. SUGGESTIONS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

HUSCH BLACKWELL, LLP
John Power
John.Power@huschblackwell.com
Michael Owens
Michael.Owens@huschblackwell.com
4801 Main Street, Suite 1000
Kansas City, MO 64112-2551

Attorneys for Defendant Bannister Bancshares, Inc.

## TABLE OF CONTENTS

| | Page |
|---|---|
| **PRELIMINARY STATEMENT** | 1 |
| **RESPONSE TO PLAINTIFF'S ADDITIONAL STATEMENT OF UNCONTROVERTED MATERIAL FACTS** | 2 |
| **ARGUMENT AND AUTHORITY** | 3 |
|     A.   BBI Did Not Breach the Indenture | 3 |
|     B.   Plaintiff is Statutorily Prohibited From Bringing its Claim Because of Champerty | 7 |
|     C.   Plaintiff's Claims Are Equitably Prohibited | 8 |
| **CONCLUSION** | 8 |

# TABLE OF AUTHORITIES

**Federal Court Cases**

*Crews v. Monarch Fire Protection Dist.*,
   771 F.3d 1085 (8th Cir. 2014) ................................................................................. 2

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
   691 F.2d 1039 (2d Cir 1982) ............................................................................ 4, 5, 6

*World Trade Center Disaster Site Litigation v. City of New York*,
   754 F.3d 114 (2d Cir 2014) ................................................................................... 4, 5

**State Court Cases**

*Concord Real Estate CDO 2006-1, Ltd. V. Bank of America, N.A.*,
   996 P.2d 324 (Del. Ch. 2010) ................................................................................... 4

*In re Bank Atlantic Bancorp, Inc. Litig.*,
   39 P.3d 824 (Del. 2012) ....................................................................................... 4, 6

*Jostinian SPC v. West LB AG & C*,
   2016 NY SLIP OP 07047 *5-6 (N.Y. Oct. 27 2016) ................................................ 7

*Tommy Hilfiger USA v. 25 West 39th Street Realty*,
   2008 NY SLIP Op. 32390 .......................................................................................... 5

*Trust for Cert. Holders of Merrill Lynch Mtge. Invs, Mtge Pass-Through Certificates,*
   *Series 1990-C1 v. Love Funding Corp.*,
     13 NY3d 190 (2009) ............................................................................................ 7

**Federal Rules and Regulations**

Fed. R. Civ. P. Rule 56(c)(1) ............................................................................................ 2

**Additional Authorities**

American Bar Foundation Commentaries on Indentures (1971) ................................. 4, 5

**PRELIMINARY STATEMENT**

Hildene MF's Opposition to BBI's Summary Judgment is based largely on semantics and its misapplication of the Indenture language. For the most part, Hildene MF does not dispute BBI's Statement of Uncontroverted Material Facts ("SUMF"). To the extent that Hildene MF did "deny" BBI's SUMFs, it largely did so by creating contrived denials. For example, Hildene MF denied facts that were never asserted by BBI (see e.g., SUMF #7 and #28)[1] or it denied facts by engaging in semantics (see e.g., SUMF #53)[2] or it denied facts by simply arguing a non-asserted issue and providing no support in the record for its argument (see e.g., SUMF #51 and #52).[3] In fact, Hildene MF's responses to SUMF #21, #56-58 are nothing but polemic arguments and not a direct refutation of the asserted facts.

Hildene MF's legal arguments are equally wanting. Hildene MF's arguments ignore the foundation upon which its most relied upon case depends, namely the ABA Foundation Commentaries on Indentures. The Commentaries provide a relatively straight-forward assessment that the Indenture does not include Union Bank's ("Union") property because the Indenture does not refer to BBI's subsidiary's property.

But even if one performed a qualitative analysis to the underlying transaction (which is not necessary in this case), the Court should still find that there was no breach of the Indenture because BBI's "operations" and ability to pay off the debentures was the same before and after the APAA. Before the APAA, BBI's ability to pay off the TruPS was from dividends it might receive as a shareholder of Union. After the APAA, BBI's ability to pay off the TruPS is from

---

[1] In SUMF #7, BBI stated that Hildene MF was in the business of investing in distressed secondary positions in collateralized debt obligations. BBI never stated that those investments were Hildene MF's primary or only business. Similarly, Hildene MF disputed SUMF #28 insofar as BBI was a limited party to the Asset Purchase Assumption Agreement ("APAA"), even though SUMF #28 makes no reference whatsoever to BBI.

[2] In response to SUMF #53, Hildene MF suggested that it approached BBI to discuss a non-litigation resolution when the Court ordered it to engage in mediation.

[3] BBI simply stated in SUMF #51 and #52 that Hildene MF claimed (i.e., it made the assertion in its Complaint) that it was acting as the purported assignee of the U.S. Bank claim. Now, Hildene MF denies its own pleading and it argues about the validity (or lack thereof) of the assignment. Hildene MF cites nothing to support its argument.

KCP-4774217-1                                  1

dividends that it might receive as a shareholder of Union (from payments made by Arvest to Union). Because BBI satisfies the "guiding inquiry" of the qualitative assessment, the Court should conclude that BBI did not convey all or substantially all of its assets when Arvest and Union entered into the APAA.

## RESPONSE TO PLAINTIFF'S ADDITIONAL STATEMENT OF UNCONTROVERTED MATERIAL FACTS

60. Hildene MF's first statement is not a fact but rather it is an argument that Hilden MF may or may not advance at trial. Arguments or expression of opinions are not appropriate in statements of Uncontroverted Material Fact sections of Summary Judgment briefs. In any event, Huygens never undertook an examination of either Union's solvency at the time of the APAA, or the priority or avoidability of the FDIC's cross-liability guaranty relative to other Union and/or Bannister creditors because it was outside the scope of Huygens' report. Ex. 16 at p. 13. Plaintiff limited Huygens' report even though Huygen understood that the FDIC's lien was on Union's assets. Huygens' deposition, pp. 72:11 – p. 73:7 attached hereto and made a part hereof at Exhibit Y.

61. Again, Plaintiff's paragraph 61 fails to comply with the requirement of Fed. R. Civ. P. Rule 56(c)(1). Huygens' assessment of a 363 sale is flawed for summary judgment purposes because paragraph 61 is an expression of an opinion and it is not a statement of fact. Also, Huygens ignored the existence of the significant lien on Union's assets. Exhibit Y, pp. 108:16 – 109:20, Exhibits 17-19 are hearsay and therefore inadmissible and should not be considered. Crews v. Monarch Fire Protection Dist., 771 F.3d 1085, 1092 (8th Cir. 2014) (Newspaper articles are "rank hearsay that do not fit a hearsay exception." (citation omitted)). The SUMF is not the place for Plaintiff to argue its case.

62. Plaintiff engages in more argument as opposed to stating an uncontroverted fact. It also misstates Ex. 11. In Exhibit 11, Mr. Kelly states that although the FDIC made clear that it

expects to receive 80% - 90% of the sale proceeds in order to justify a waiver of the cross guaranty, it (the FDIC) was open to sharing proposals other than 80 - 90%. Obviously, if the FDIC took less than 80 - 90% of the sale proceeds, the TruPS holders would receive more of the proceeds. Exhibit 11 is inadmissible hearsay. But in any event, the context of Kelly's statement is that the FDIC was open to other percentages as it pertained to the Arvest deal, not just any deal. See *Ex. 11* ("… to discuss our proposal." (emphasis added)). See also Exhibit A at p. 48:9 – 49:1; 49:10 – 50:7 (the "direct comments of the regulators" caused BBI to understand that they were going to impose the cross guarantee at any time) and p. 154:10-15; 22 - p. 155:6.

63.     Plaintiff engages in unsupported argument about what the Waltons' desires were and what they could or could not have done. Plaintiff never deposed any of the Waltons and therefore it can only speculate as to what their desires may have been. Unsupported statements of Material Fact are not appropriate under Rule 56.

64.     Argumentative and disputed. Because of the rapidly eroding capital base and the cross guaranty, Union Bank's value was $98 to $100 million in the hole. Exhibit A at 172:10 – 174:7; 80:1-15.

**ARGUMENT AND AUTHORITY**

**A.    BBI Did Not Breach the Indenture**

In order for Hildene MF to argue that there was a breach of the Indenture, it needs to have the Court imply a missing term that the parties somehow neglected to specifically include. Specifically, Hildene MF wants the Court to insert the new term "or its subsidiaries" into the Indenture so that the sale of BBI's assets or the sale of BBI Subsidiaries' assets would trigger the Indenture Provision. Plaintiff's demand is contrary to the plain language of the Indenture, the Commentaries on Indentures and New York law.

When assessing Indentures, courts frequently looks to the American Bar Foundation Commentaries on Indentures (1971) ("Commentaries"). See Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1048, (2d Cir 1982) and In re Bank Atlantic Bancorp, Inc. Litig., 39 P.3d 824, 837 (Del. 2012) ("The Commentaries 'provide powerful evidence of the established commercial expectations of practitioners and market participants.'" (citing Concord Real Estate CDO 2006-1, Ltd. V. Bank of America, N.A., 996 P.2d 324, 423 (Del. Ch. 2010)). Although Plaintiff cites these cases as authoritative, it fails to even refer to The Commentaries, let alone assess the effect of The Commentaries on the provision in question. The Commentaries support BBI's position.

The Defendants have established, and the Plaintiff does not dispute, the following:

(1)  The Indenture has separate and distinct definitions for "Company" and "Subsidiary."  See Ex. A to Arvest's Motion for Summary Judgment (hereafter Arvest's Exhibit A);

(2)  In certain provisions of the Indenture, the parties refer to both the Company and its Subsidiary.  Arvest's Exhibit A at § 3.10; and

(3)  The Successor Obligor Provision in the Indenture specifically refers to the Company without making any reference to Subsidiary. Arvest's Exhibit A at § 11.1.

The Commentaries clearly provide that if the Successor Obligor Provision is supposed to restrict the sale of the Company's subsidiary's assets to a third party, it (the Indenture) needs to expressly provide for that restriction. See Commentaries at p. 426. See Arvest Ex. 55, Sample 5. Accordingly, the meaning of the Indenture is "susceptible of the standardized expression" (Sharon Steel Corp. 691 F.2d at 1048) that company means company and it does not mean company and its subsidiary.

BBI's interpretation of the Indenture is further bolstered by the court's analysis in World Trade Center Disaster Site Litigation v. City of New York, 754 F.3d 114 (2d Cir 2014).  In World Trade Center, the court determined that it could properly supply a missing term only in

very limited circumstances. The circumstances to supply a missing term exist "if the contract is ambiguous and the term may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent." World Trade Center, 754 F.3d at 122. But even if these circumstances do exist, courts "should be 'extremely reluctant,' however, to imply a term the 'parties have neglected to specifically include.'" Id., at p. 123 (citations omitted).

In this present case, the Indenture is not ambiguous. The parties demonstrated that they knew and appreciated the difference between the company and subsidiary and it specifically included both entities in certain provisions and specifically excluded the subsidiary in other provisions. In fact, the best evidence of the parties intent that the subsidiary was not part of the Successor Obligor Provision is that it (the Subsidiary) was not identified in § 11.1 but it was elsewhere. Consequently, the limited circumstances to imply a term to § 11.1 do not exist in this case and the court should refrain from doing so here. Id. Thus, under either standardized language analysis in the Commentaries or the limited circumstances test in World Trade Center, the court should not create a term to insert into the Indenture. Plaintiff has not cited to any cases that conflate subsidiary into company and the Court should not conflate the terms now. Uniformity of interpretation of company as being separate from subsidiary (as stated in the Commentaries) is important to the efficiency of capital markets. Sharon Steel Corp., 691 F2d at 1048. This is done as a matter of law and not fact. Id.[4]

For the reasons stated supra, pp. 4-6, the Qualitative analysis set forth in Bank Atlantic is neither necessary nor appropriate analysis to determine the clear meaning of the Indenture. But even if the Court undertook this unnecessary analysis, the conclusion would be the same, the APAA does not violate the terms of the Indenture. "The guiding inquiry when evaluating a transaction qualitatively in whether the debtor 'would cease to operate the business to which, in a

---

[4] Plaintiff argues that the Court should ignore Tommy Hilfiger USA v. 25 West 39th Street Realty, 2008 NY SLIP Op. 32390 because it does not specifically pertain to Indentures. What Plaintiff fails to ascertain, however, is that Tommy Hilfiger is consistent with the Court's approach in World Trade Center and Sharon Steel Corp.

practical effect, the debenture holders have looked for payment of the debentures.'" In re Bank Atlantic Bancorp, Inc. Litigation, 39 A.3d 824, 843 (Del. 2012) (citing Commentaries at 423).

Prior to the sale of Union, BBI's business was to be shareholder in Union. At the time, Union was subject to a $120 million cross guaranty issued by the FDIC. Moreover, the FDIC's direct comments made it clear to BBI that it (the FDIC) was going to impose the cross-guarantee at any time. Ex. A, p. 48:9-49:1, 49:10-50:7. Union was unable to make any distribution to BBI or pay off any of the debentures without first receiving the approval of the FDIC, the Federal Reserve Bank-Kansas City and the Director of the Division of Banking Supervision and Regulation. See Exhibits J and N. If the cross-guarantee was imposed, Union would have to close and BBI would go into bankruptcy. Id. In other words, BBI's business as shareholder of Union provided little or no likelihood that the debentures would be paid. After the sale of most of Union's assets and liabilities to Arvest, BBI continued to be in the business of being a shareholder in Union. Under the transaction, however, the $120 million cross-guarantee that put BBI on the precipice of bankruptcy was gone and there is now a chance that Arvest will make a payment to Union which would then flow to the FDIC and BBI. To the extent BBI receives a payment it would go to the TruPS holders. Thus, the likelihood that the TruPS holders will get paid post APAA is at least as good, if not better, than what existed prior to the sale. See Sharon Steel Corp., 691 F.2d at 1050 (the lenders were protected by assuring a degree of continuity of assets.) Here, the assets were the same and the lenders were at least as protected, if not more so by the transaction.

The Union APAA is in stark contrast with the machinations that Bancorp went through in the Bank Atlantic case. In Bank Atlantic, Bancorp divided up Bank Atlantic's assets so that one entity received all the clean assets and was without any Debt Securities and the new entity would hold all the criticized assets and Debt Securities (a good bank/bad bank concept). Bank Atlantic,

KCP-4774217-1
6
Case 4:14-cv-01110-ODS   Document 184   Filed 01/04/17   Page 9 of 13

39 A.3d at 834.  Thereafter, Bank Atlantic ascribed all the value to the "bad bank" and sold its own property (i.e., the stock of Bank Atlantic, the good bank) to a third party.  After the sale the stock in Bank Atlantic was no longer available to Bancorp to assist it in paying off the debentures.  Id., at 838.  Thus, the holders of the debentures in Bank Atlantic were in a fundamentally different position than the debenture holders in this case.

BBI, unlike Bankcorp, has not sold any of its assets.  BBI's assets are therefore still available to it to potentially pay off the debentures.  Moreover, the contingent payout that could flow from Union to BBI provides a repayment potential that did not exist before the APAA.  The reality is that the APAA represents the best chance for debentures to be paid.

**B.     Plaintiff is Statutorily Prohibited From Bringing its Claim Because of Champerty**

When determining whether the champerty statute applies to a given claim, New York courts focus on the purpose behind why the Plaintiff acquired the Notes, Assignment, etc. and not on the reason behind why a company may exist.[5]  See Trust for Cert. Holders of Merrill Lynch Mtge. Invs, Mtge Pass-Through Certificates, Series 1990-C1 v. Love Funding Corp., 13 NY3d 190, 198-199 (2009)(the purpose behind Plaintiff's acquisition of rights is the critical issue in assessing whether the acquisition is champertous.)  If the purpose of the acquisition is to sustain an action, it is champertous and prohibited.  Justinian SPC v. West LB AG & C, 2016 NY SLIP OP 07047 *5-6 (N.Y. Oct. 27 2016).

Here the evidence is that Hildene MF's acquisition of the assignment was for the primary purpose of keeping its (improperly brought) lawsuit alive.  Put differently, Hildene MF would have forever lost the right to bring the suit without obtaining the assignment.  Thus, Hildene MF's purpose for the acquisition was to sustain the lawsuit.  Consequently, the acquisition is champertous and should be prohibited.

---

[5] BBI does acknowledge that the reason or purpose for why a company was formed may be instructive as to why an entity acquired the notes.  It is not, however, the only means to assess the acquisition of a note, as Plaintiff implies.

## C. Plaintiff's Claims Are Equitably Prohibited

There is no dispute that Plaintiff was aware of the APAA at or around the time it was entered into. There is also no dispute that Plaintiff complained about the transaction. And, the Plaintiff cannot dispute that for years after its initial complaints, it ceased to make any complaints or threats to BBI. Plaintiff seems to argue that it was active behind the scenes to do the things it had to do to get the assignment. But this explanation does not make any sense because Hildene MF, as well as other Hildene entities, sued the Defendants before it obtained the assignment.[6] But even if Plaintiff's explanation is true, it never put the Defendants on notice that it was undertaking such efforts. Plaintiff's silence caused the Defendants to conclude that the sale was going to be consummated without any litigation. Likewise U.S. Bank was aware of the transaction. U.S. Bank, however, affirmatively stated that it would take no further action with regard to the transaction. To permit Plaintiff to enforce its rights now would be fundamentally unfair to BBI.. Irrespective of what Hildene MF claims it had to do to get the assignment, U.S. Bank had to do nothing other than bring the claim. It chose to do nothing. U.S. Bank's inaction should preclude it from asserting any rights, directly or indirectly.

## CONCLUSION

Plaintiff cannot escape the plain and unambiguous meaning of the Successor Obligor Provision. There has been no breach. Additionally, Plaintiff is statutorily and equitably precluded from bringing any of its claims. BBI requests that the Court grant summary judgment in its favor.

---

[6] This sequence of events further demonstrates that Plaintiff obtains the assignment for the purpose of properly bringing the claim.

Dated: January 4, 2017                              Respectfully submitted,

                                                    */s/ John K. Power*
                                                    John K. Power          MO Bar No. 35312
                                                    Husch Blackwell LLP
                                                    4801 Main Street, Suite 1000
                                                    Kansas City, Missouri 64112
                                                    Telephone: (816) 983-8000
                                                    Facsimile: (816) 983-8080
                                                    john.power@huschblackwell.com

                                                    **Attorney for Defendant**
                                                    **Bannister Bancshares, Inc.**

# CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of January, 2017, the original of the above and foregoing was served via electronic mail to:

Daniel B. Hodes
German May PC
1201 Walnut, Suite 2000
Kansas City, MO 64106
Telephone: 816-471-7700
Fax: 816-471-2221
danh@germanmay.com

Ethan A. Brecher
Law Office of Ethan A. Brecher, LLC
600 Third Avenue, 2nd Floor
New York, NY 1006
Telephone: 646-571-2440
Fax: 888-821-0246
ethan@ethanbrecherlaw.com

**Attorneys for Plaintiff**

Squire Patton Boggs
Joseph C. Weinstein
Joe.weinstein@squirepb.com
Sean L. McGrane
Sean.mcgrane@squirepb.com
4900 Key Tower, 127 Public Square
Cleveland, OH 44114
Tel: (216) 479-8500
Fax: (216) 479-8780

Shook Hardy & Bacon
Michael S. Cargnel
mcargnel@shb.com
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
Fax: (816) 421-5547

**Attorneys for Defendant Arvest Bank**

*/s/ John K. Power*
**Attorney for Defendant**